[Cite as *State v. Greene*, 2019-Ohio-4010.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 17AP-238 |
| | | (C.P.C. No. 15CR-1206) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Charles J. Greene, | : | |
| Defendant-Appellant. | : | |

### D E C I S I O N

#### Rendered on September 30, 2019

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Kimberly Bond*, for appellee. **Argued**: *Kimberly Bond*.

**On brief**: *Carpenter Lipps and Leland LLP*, *Kort Gatterdam*, and *David F. Hanson*, for appellant. **Argued**: *David F. Hanson*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Charles J. Greene, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of murder, aggravated robbery, and kidnapping.

{¶ 2} On March 12, 2015, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, one count of murder, in violation of R.C. 2903.02, one count of aggravated robbery, in violation of R.C. 2911.01, and two counts of kidnapping, in violation of R.C. 2905.01. The indictment arose out of the death of Alyce Seff, age 81, in July 2008.

{¶ 3}    The matter came for trial before a jury beginning January 18, 2017.  Charles Lyder testified on behalf of plaintiff-appellee, State of Ohio.  In 2008, Lyder, age 46, resided on South Pearl Street.  His landlady was Alyce Seff, who he began renting from in March 2007.  Seff owned several rental properties in the area.  Lyder always paid his rent to Seff in cash.  Seff would then hand him "a paper receipt out of a cash receipt book." (Tr. Vol. I at 84.)  Seff regularly wore a "green army jacket," and she kept money in the "right chest pocket" of the jacket.  (Tr. Vol. I at 84.)  According to Lyder, Seff kept a "pretty thick wad of cash" in her pocket.  (Tr. Vol. I at 85.)  When repairs were necessary, Seff "hired people that * * * needed money."  (Tr. Vol. I at 86.)

{¶ 4}    On June 23, 2008, Lyder and his two daughters departed Columbus to spend two weeks in New Hampshire.  Lyder returned to Columbus on July 9, 2008.  Later that evening, Lyder and one of his daughters went to the back of his residence, and Lyder "smelled death."  (Tr. Vol. I at 91.)  Lyder thought he smelled a dead animal.  His daughter then said, "Hey, I found some money."  (Tr. Vol. I at 91.)  She found the money near "a little wishing well" off the side of Seff's house.  Lyder walked toward his daughter and observed a wig and credit cards scattered on the ground.  Lyder picked up one of the cards and "saw the name of Alyce Seff."  (Tr. Vol. I at 92.)  He then walked to a nearby neighbor's apartment building and told the neighbor's roommate "something was wrong." (Tr. Vol. I at 93.)

{¶ 5}    Lyder phoned Seff's cell phone "and it went to voicemail."  (Tr. Vol. I at 94.) He then called Seff's home phone but there was no response.  Lyder and the neighbor returned to the area of the wishing well.  Lyder observed blood on the wig and also noticed blood splatter marks on a nearby fence.  He recognized the wig as "the same color and length of my landlord's wig, Alyce Seff."  (Tr. Vol. I at 96.)  Lyder then noticed cushions on top of the wishing well.  He pulled up one of the cushions and "saw some fingers."  (Tr. Vol. I at 95.)  Lyder and the neighbor then returned to the apartment and dialed 911.

{¶ 6}    Seff drove a dark blue Ford Escort, which Lyder described as a "late 90's model."  (Tr. Vol. I at 101.)  The vehicle "was not well-kept, and in the inside it had a lot of junk, * * * sometimes a rake, bags."  (Tr. Vol. I at 100-01.)  Lyder never observed anyone else drive the vehicle.  Seff usually parked the vehicle on High Street, but sometimes on

Pearl Alley.  After discovering Seff's body, Lyder did not observe Seff's vehicle in the area.  Lyder gave police a description of the vehicle.

{¶ 7}  On July 9, 2008, at approximately 8:40 p.m., Columbus Police Officer Stephen Mason received a dispatch regarding "a neighbor who * * * thought he had discovered his landlady, the property owner, either deceased or ill."  (Tr. Vol. I at 60.)  Officer Mason arrived at the scene and spoke with Lyder.  The officer "could immediately smell an odor of * * * decay."  (Tr. Vol. I at 61.)

{¶ 8}  Officer Mason walked to the back of the residence and "initially saw what looked like the contents of a purse that had been dumped out, just random cards."  (Tr. Vol. I at 62.)  The officer then observed a decorative wishing well.  He walked over to the well and "noted there [were] cushions sort of stacked around, and on top of it, * * * the cushions that have kind of a plastic vinyl covering on them."  (Tr. Vol. I at 63.)  Several medics had also arrived at the scene.

{¶ 9}  When Officer Mason initially moved one of the cushions, he observed "a human foot."  (Tr. Vol. I at 64.)  The officer then shined his flashlight and observed "the victim."  (Tr. Vol. I at 64.)  The body, which was in an "upside down position," was "discolored."  (Tr. Vol. I at 65.)  It was clear to the officer and medics that the individual was deceased, and the medics pronounced Seff dead at that time.

{¶ 10}  The victim was identified as Alyce Seff.  Officer Mason was familiar with Seff from patrolling that neighborhood.  Officer Mason described Seff as "a well-known property owner in the area.  She had a number of properties all around her in the village."  (Tr. Vol. I at 68.)  According to the officer, Seff "would walk to each tenant and specifically collect rent, sort of * * * an old school way of doing business."  (Tr. Vol. I at 69.)  Seff drove a blue Ford Escort and, although it was well know that she "was somewhat wealthy," it seemed "odd to everyone that she drove that sort of a down-trodden vehicle that was always kind of in disrepair."  (Tr. Vol. I at 69.)  The officer never observed anyone but Seff driving the vehicle.

{¶ 11}  On July 9, 2008, Columbus Police Detective Richard Bair, a member of the department's crime scene search unit, photographed and collected evidence in the area of the 800 block of South High Street.  On July 16, 2008, Detective Bair collected items from Seff's vehicle.  DNA swabs were taken and submitted to the police property room.  During

his testimony, Detective Bair identified photographs taken of the crime scene; he also identified the items collected at the scene, including a roll of duct tape.

{¶ 12} In July 2008, Marc Green worked as a crime scene search unit detective for the Columbus Police Department.  On July 10, 2008, Green collected evidence and photographed Seff's body at the Franklin County morgue.  Green described Seff's body as "very badly decomposed, very bad stage of decomposition."  (Tr. Vol. I at 161.)  At trial, Green identified the photographs he took of Seff, as well as items collected.  Seff had duct tape "bound around both wrists."  (Tr. Vol. I at 165.)  Green identified items of clothing worn by Seff.  A cell phone case was found on Seff's body, and a shirt had been wrapped and tied around her head and neck.

{¶ 13} Edward Babcock is an employee of Murray's Tool Rental, a small equipment rental and repair business.   Babcock was acquainted with Seff, who would regularly come into the tool rental store; Babcock considered her to be "a friend, not a customer."  (Tr. Vol. II at 183.)  Seff "always wore the same outfit * * * it was always a dark heavy canvass, long skirt, black * * * boots, a green -- everybody calls it an army shirt, but it actually said U.S. Air Force on it."  (Tr. Vol. II at 191.)  Seff also wore a wig.

{¶ 14} The tool rental store had a video surveillance system.  On Saturday, July 5, 2008, Seff entered the store and her visit was captured on video.  Seff brought a hedge trimmer to the store for sharpening.  At trial, the state played a portion of the surveillance video taken at the store on July 5, 2008.  Babcock identified Seff on the video; she entered the store shortly before noon, wearing the "[s]ame outfit she always wore."  (Tr. Vol. II at 194.)  Seff left the store at 12:04 p.m.  Babcock never saw her after that day.

{¶ 15} Babcock testified that Seff always paid in cash.  She kept the money "in her pocket, a big old wad.  She kept a lot of money on her."  (Tr. Vol. II at 201.)  Seff is depicted on the video taking money out of her shirt pocket.  Babcock subsequently learned Seff had died and spoke with a police officer he knew; Babcock told the officer she had recently been to the store.  The officer was interested in obtaining "a picture of her car." (Tr. Vol. II at 189.)

{¶ 16} Barbara Carmen Fisher was a family friend of Seff's, and Fisher's mother and Seff were best friends for approximately 40 years.  Fisher was aware that Seff "was quite wealthy."  (Tr. Vol. II at 215.)  Seff "carried wads of cash," and earned her money

through real estate and as a landlord; she owned approximately 15 properties, as well as her own home. (Tr. Vol. II at 216.) In July 2008, Seff was living at her residence in German Village. Seff wore a wig, and "she often shopped at the army/navy store and she wore * * * combat fatigues." (Tr. Vol. II at 231.)

{¶ 17} Seff had a cell phone as well as a home phone, and Fisher's mother usually talked to Seff on a daily basis. Over the 2008 Fourth of July weekend, Fisher and her mother made various calls to Seff's cell and home phones after not hearing from her. On July 9, 2008, Fisher drove to one of Seff's residences and observed numerous police vehicles.

{¶ 18} Fisher assisted police in obtaining Seff's bank records; it was discovered that Seff's credit cards "had been used within a recent day or two." (Tr. Vol. II at 229.) The bank president informed Fisher "these are from Walmart. They have cameras. Go talk to the detective immediately, and handed me the report, which is what I did." (Tr. Vol. II at 229.)

{¶ 19} Seff had a blue Ford Escort, which Fisher described as "very old," and "stuffed full of things that she had either cleaned out of her property, or that she had found at the thrift store, or tools and materials that she used for working on the properties." (Tr. Vol. II at 229-30.) Fisher never observed anyone except Seff drive the vehicle.

{¶ 20} Norma Jenkins, age 50, has been a Columbus resident most of her life. Jenkins knows appellant, and testified his friends call him "Jerome." (Tr. Vol. II at 242.) In July 2008, Jenkins resided with her mother and a friend, Jane Benvenutti. At that time, appellant was living with a "lady named Valorie" on Fabron Avenue. Appellant's residence was close to where Jenkins lived on Atcheson Street. In July 2008, Jenkins and appellant were "fooling around." (Tr. Vol. II at 244.) Jenkins described herself as "just one of" appellant's girlfriends at the time. (Tr. Vol. II at 245.)

{¶ 21} In July 2008, appellant "worked for a lot of people in the neighborhood," including Seff. (Tr. Vol. II at 246.) Appellant performed "[h]andy work," and his duties for Seff included yard work and painting. (Tr. Vol. II at 246.) Seff would drive by and pick up appellant. Appellant worked for Seff "two, three times a week." (Tr. Vol. II at 248.)

{¶ 22} On July 5, 2008, Jenkins observed Seff pick appellant up on Fabron Avenue. A few days later, Jenkins learned from the news that something had happened to Seff. Jenkins was concerned because, approximately two weeks prior to that, appellant "asked me to act like I was paying rent and push her down and rob her." (Tr. Vol. II at 252.) Jenkins told appellant "[n]o." (Tr. Vol. II at 253.)

{¶ 23} On July 5, 2008, appellant phoned Jenkins at her mother's residence. Appellant had obtained Seff's phone, and he gave Jenkins "several different stories" regarding why he had her phone. (Tr. Vol. II at 257.) At first, appellant stated the phone "was given to him, and then Alyce gave it to him." (Tr. Vol. II at 259.) At one point, appellant stated "he broke in the house after he found out she was dead and robbed her." (Tr. Vol. II at 260.) Jenkins subsequently observed appellant with credit cards belonging to Seff, including a "Lowe's card." (Tr. Vol. II at 260.) Appellant asked Jenkins to use the Lowe's card but she refused.

{¶ 24} After Seff's death, police investigators questioned Jenkins and asked her if she had used a Lowe's card for purchases. Jenkins told investigators she did not make any purchases with the card. Jenkins told police that appellant "had asked me to act like I was going to pay my rent and push her down and rob her, but I didn't." (Tr. Vol. II at 263.)

{¶ 25} On cross-examination, Jenkins acknowledged she had a prior theft conviction, and she was using crack cocaine and marijuana in 2008. When asked if she used cocaine powder or crack cocaine more often, Jenkins responded: "Cocaine with Charles Greene." (Tr. Vol. II at 278.)

{¶ 26} On re-direct examination, Jenkins stated she was using crack cocaine with appellant around July 5, 2008. After Seff's death was reported, Jenkins did not see appellant "for a while." Jenkins stated appellant acted paranoid, as if "somebody was trying to get him." (Tr. Vol. II at 313.)

{¶ 27} Daniel Davison, a forensic scientist with the Bureau of Criminal Investigation, examined several pieces of duct tape as well as several rolls of duct tape recovered as part of the investigation. Four rolls of duct tape were recovered from Seff's vehicle, while another roll of duct tape, identified as state's exhibit No. J8, was recovered in the backyard. Pieces of duct tape, identified as state's exhibit Nos. K5 and K6, were

obtained from Seff's left wrist.   Exhibit Nos. K5 and K6 "had the same physical characteristics."  Further, "[o]ne of the edges from K5 formed a physical break match with the end of the roll of tape that was * * * Exhibit J8."  (Tr. Vol. II at 352.)   Davison concluded the duct tape recovered from Seff's wrist came from the duct tape roll found in the backyard.

{¶ 28} At trial, the state played the video deposition of Raman Tejwani, formerly an employee of the Columbus Police Crime Lab.  Tejwani has a Ph.D. in physiological chemistry, and her duties with the crime lab included "analysis of biological fluid and DNA for the evidence that was submitted to the crime lab forensic biology section."  (Tr. Vol. III at 375.)  Tejwani was asked to review items from the investigation, including duct tape, a plaid flannel shirt, and fingernail clippings.

{¶ 29} Tejwani testified that the duct tape and shirt were "not suitable for DNA analysis."  (Tr. Vol. III at 384.)  Fingernail clipping samples were obtained from both of Seff's hands, and Tejwani was able to conduct DNA analysis for the fingernail clippings, identified as state's exhibit No. K11.  Tejwani testified there were "five nail clippings, and traces of red stains were seen on all the five tested.  They all tested positive for blood." (Tr. Vol. III at 385.)  One of the clippings "matched the DNA types obtained from the blood standard of Alyce Seff."  (Tr. Vol. III at 386.)

{¶ 30} DNA samples were obtained from Seff's vehicle, including "the steering wheel, the gear shifter, rearview mirror, nail on driver's door, nail on driver's side door arm rest, and driver's side door handle."  (Tr. Vol. III at 390.)  Some of the DNA samples from the vehicle were not suitable to make any conclusions.  With respect to the sample from the gearshift, state's exhibit No. L2, Tejwani concluded that appellant "cannot be excluded as a contributor."  (Tr. Vol. III at 397.)  With respect to state's exhibit Nos. L1 and L6, swabs obtained from the steering wheel and a nail on the driver's side arm rest "matched the DNA types obtained from oral swab standard of Charles Greene."  (Tr. Vol. III at 399.)

{¶ 31} Tejwani also examined a cell phone cover but there was an insufficient amount of DNA to obtain information as to a contributor.  DNA samples of blood recovered from a fence near the scene matched the DNA types obtained from the blood standard of Seff.

{¶ 32} Brenda Greathouse, age 59, has lived in Columbus most of her life. Greathouse has known appellant for approximately 25-30 years, and calls him "Jerome." (Tr. Vol. III at 451.) In 2008, appellant was living with a woman named "Valorie." (Tr. Vol. III at 452.) Appellant was "doing odd jobs for * * * different people" at the time. (Tr. Vol. III at 454.)

{¶ 33} In 2008, a detective spoke with Greathouse about phone calls appellant made to her on July 6, 2008. The calls began in the early morning hours on that date; Greathouse did not recognize the phone number, but eventually realized appellant was calling from that number. Appellant told Greathouse "he had found the phone." (Tr. Vol. III at 458.) Appellant told her he found the phone "[e]ither at the store or going to the store." (Tr. Vol. III at 458.)

{¶ 34} Later in the day on July 6, 2008, appellant arrived at Greathouse's residence with several credit cards. Appellant gave her the cards; Greathouse informed appellant she was "going to give them to my friend to use, and he just said to make sure he got some stuff too." Her friend was "Norita Sams." (Tr. Vol. III at 461.) Greathouse picked up Sams and gave her the cards; they then drove to "a gas station, to a CVS, a Kroger's, Meijer's and Walmart." (Tr. Vol. III at 462.) The stores were located in the "Morse Road, Cleveland Avenue area." (Tr. Vol. III at 462.) Greathouse and Sams bought items for themselves as well as for appellant. After purchasing the items, Greathouse gave the credit cards to appellant "[b]ecause he asked for them back." (Tr. Vol. III at 465.)

{¶ 35} Later, Greathouse learned from the news "that a lady had been murdered. We had used the cards, me and a friend of mine, and the name just popped in my mind as soon as I seen it on TV." (Tr. Vol. III at 460.) Appellant told Greathouse "he had got them from, I guess, * * * the person they belonged to, to go purchase some materials. But I knew that wasn't so." (Tr. Vol. III at 460.) Greathouse "knew they was probably stolen." (Tr. Vol. III at 461.)

{¶ 36} Dr. Patrick Fardal, retired, was formerly chief forensic pathologist and deputy coroner for Franklin County. Fardal reviewed the coroner's report, including photographs of the victim, Seff; the photographs "showed levels of decomposition." (Tr. Vol. III at 493.) The autopsy was performed on July 10, 2008. Dr. Fardal opined Seff had

been dead for "four to five days prior" to the autopsy.  (Tr. Vol. III at 504.)  He further stated, based on the signs of decomposition, Seff could have died on July 5, 2008.

{¶ 37} Dr. Fardal noted "ligature around her neck."  (Tr. Vol. III at 505-06.)  The ligature "was knotted on the right side of her neck.  It was tied around her neck."  (Tr. Vol. III at 506.)  Dr. Fardal concluded the cause of death was "ligature strangulation."  (Tr. Vol. III at 509.)

{¶ 38} Dr. Fardal was questioned about the presence of blood on a nearby fence at the crime scene.  He stated the blood "came off either [Seff] or an object" that could have been used to strike Seff.  (Tr. Vol. III at 515.)  While noting the difficulty in assessing the location of a wound due to the state of decomposition of the body, Dr. Fardal theorized Seff likely sustained an injury involving the face and head, and that blood from this wound "was thrown in space against the fence."  (Tr. Vol. III at 520.)

{¶ 39} Feather Johnson, age 39, has lived in Columbus 15 years.  In 2008, Johnson resided in a duplex on South High Street.  Lyder lived in a nearby residence on Pearl Street.  Johnson also knew Seff, who owned the property next to her duplex.  Seff would hire individuals to work for her that were "probably not employed, people that definitely appear to me that have some type of issues, drinking, drug issues, who knows what it may be."  (Tr. Vol. III at 550.)

{¶ 40} Approximately one week before July 5, 2008, Johnson observed Seff speaking with an individual who was "planning to do work for her."  (Tr. Vol. III at 550.)  At trial, Johnson identified appellant as the individual she observed at Seff's house.

{¶ 41} In July 2008, Lyder was on vacation with his daughters, and Johnson was watching Lyder's dog.  On July 9, 2008, Lyder returned home from his vacation.  That evening, Lyder and one of his daughter went over to Johnson's duplex; Lyder seemed alarmed, and asked Johnson about the last time she saw Seff.  Johnson indicated she had seen Seff "less than a week prior to that date."  (Tr. Vol. III at 556.)

{¶ 42} Lyder then asked Johnson to "walk back to the house with him."  (Tr. Vol. III at 556.)  They walked to the back of the house and "found Alyce's -- one of her shoes, her wig, and numerous credit cards laying on the ground."  Lyder also "found * * * blood splatter on the fence, and he asked [Johnson] to take his daughter back to [her] front porch."  (Tr. Vol. III at 557.)  Lyder then dialed 911.

{¶ 43} Several years later, police officers showed Johnson a photo array and asked her if she recognized any of the individuals as "being at Alyce's house." (Tr. Vol. III at 558.) Johnson identified the individual depicted in photograph No. 4 as looking "like the person at the house days before." (Tr. Vol. III at 559.) During her testimony, Johnson identified a photograph of Seff's vehicle. Johnson testified that Seff would normally park her vehicle "on High Street." (Tr. Vol. III at 561.) Johnson never observed anyone but Seff drive her vehicle.

{¶ 44} Columbus Police Detective Robert Moledor analyzes "cellular call detail records." (Tr. Vol. IV at 587.) Detective Moledor analyzed the records for Seff's cell phone beginning July 5, 2008. At 1:28 p.m., a call was placed to Seff's phone by a number belonging to appellant. At 2:46 p.m., a call from a number belonging to Jenkins was placed to Seff's phone number. Between the times of 10:52 p.m. on July 5, 2008, and 12:01 a.m. on July 6, 2008, "the target phone placed 16 outbound calls to six different numbers." (Tr. Vol. IV at 606.)

{¶ 45} As a result of the data collected, Detective Moledor concluded that Seff "was no longer in possession of her AT&T cellular phone" after 2:45 p.m. on July 5, 2008. The detective "based that conclusion on the calls that were being made to the phone as well as calls that were being made from the phone." (Tr. Vol. IV at 609.) Further, "[t]he majority of the tower usage by * * *, the target phone, between 2:45 p.m. on July 5th, 2008 and 10:18 p.m. July 8th, 2008 is consistent with the vicinity of Charles J. Greene's listed address [on] Fabron Avenue." (Tr. Vol. IV at 609-10.) The detective further testified the location at which Seff's vehicle was recovered was "consistent with the vicinity of the majority of tower usage between 2:45 p.m. on July 5th and 10:18 [p.m.] on July 8th; and, finally, at the location of Norma Jenkins' residence [on] Atcheson Street, Columbus, Ohio, it is consistent with the vicinity of the majority tower usage between 2:45 p.m. July 5th, 2008 and 10:18 [p.m.] July 8[th], 2008." (Tr. Vol. IV at 610.)

{¶ 46} Appellant testified on his own behalf. Appellant denied killing Seff, and denied asking anyone to rob or kill Seff. Appellant testified he learned of Seff's death through "Brenda Greathouse, who bought the credit cards." (Tr. Vol. IV at 678.) He denied breaking into Seff's home, and denied ever meeting Johnson. He also denied ever driving Seff's vehicle.

{¶ 47} In 2008, appellant worked as a "handyman." (Tr. Vol. IV at 679.) Appellant had worked for Seff "[o]ff and on about a year." (Tr. Vol. IV at 680.) When Seff needed work done, she would call him on "my girlfriend's phone." (Tr. Vol. IV at 681.) Appellant could not recall the last time he performed work for Seff.

{¶ 48} Appellant acknowledged coming into possession of Seff's cell phone and credit cards. Appellant provided the following account of how he obtained those items:

> Well, I was working for Ms. Seff. I don't know exactly what day it was, but I was cutting down some bushes of hers, and I noticed a guy working on her roof. I don't go mingling with the guy or nothing, you know. They do their work; I do my work.
>
> This guy comes to me, asked me what side of town I was from. I said, I'm from Mount Vernon and 20th area.
>
> He said, Well, I'm from the south end.
>
> You know, I never think of nothing of that. He say that's where he going to get his medicine from, on Mount Vernon and 20th.
>
> Me, I'm going to the store one day on Mount Vernon and 20th, and I see the guy, you know what I'm saying? He don't know my name; I don't know his. He's just saying, Hey, come here.
>
> I noticed him from Ms. Seff's, you know what I'm saying? Working for Ms. Seff. He said, Do you know a way I can get rid of some credit cards?
>
> I said, Yeah, I know somebody who buys credit cards.

(Tr. Vol. IV at 682-83.)

{¶ 49} When questioned as to why he interacted with this individual in obtaining Seff's items, appellant responded: "The reason I did it, because I seen the guy at Ms. Seff's. I know he worked for Ms. Seff. So I thought he might be cool to do that, help him out." (Tr. Vol. IV at 686.) When asked if he believed the items had been stolen, appellant responded: "I knew they were stolen." (Tr. Vol. IV at 686.) Appellant testified that he asked the individual "to let me use his phone so I can call my [contact]. I know the person that was going to buy them." (Tr. Vol. IV at 688.) Appellant testified he phoned

Greathouse and that he walked with the man to the residence of Greathouse; appellant handed the phone back and took the credit cards into the house.

{¶ 50} When asked what he was to receive in return, appellant testified: "He going to pay me for getting the cards sold; and she going to pay me for getting her the deal." (Tr. Vol. IV at 690.) Appellant eventually kept the phone, explaining: "After I come out of the house and gave the guy his money, he gave me money, and then I asked to use his phone so I can call Ms. Norma Jean. She wanted me to do some work too." (Tr. Vol. IV at 690.) Appellant further stated that he "ended up going in the house to tell Brenda she owes me now because she got a deal and I got the cell phone. When I come back out of the house, the guy was gone. So I kept the phone." (Tr. Vol. IV at 691.)

{¶ 51} According to appellant, the man gave him two credit cards. Appellant denied looking at the cards at the time, stating he first learned the credit cards belonged to Seff "[a]fter the detectives then talked to Brenda about using the credit cards. She told them she got the credit cards from me." (Tr. Vol. IV at 692.)

{¶ 52} On cross-examination, appellant acknowledged having signed a receipt, dated July 1, 2008, indicating Seff paid him $50. Appellant denied ever seeing Seff "with a wad of money." (Tr. Vol. IV at 699.) Appellant told detectives he received "[t]wenty dollars and a piece of crack" for the credit cards. (Tr. Vol. IV at 707.) Appellant denied that Greathouse gave the credit cards back to him. When asked about a call placed from his phone at 1:28 p.m. on July 5, 2008, appellant responded: "I don't know about that call. I guess I was probably calling Alyce for work or something. I don't know." (Tr. Vol. IV at 721.) Appellant did not recall whether he told detectives in 2012 about sitting in the driver's seat of Seff's vehicle. Appellant told detectives in 2012 and 2015 that he did not have Seff's cell phone. When asked whether he lied about using the phone, appellant stated: "I guess it was. Yes it was." (Tr. Vol. IV at 729.)

{¶ 53} The state called Columbus Police Detective Anne Pennington as a rebuttal witness. Detective Pennington participated in an interview of appellant in April 2012. Appellant told Detective Pennington he obtained the credit cards from a white male who was shorter than him; appellant indicated the man was "5'8" or so." (Tr. Vol. V at 803.) Detective Pennington identified the individual during trial and measured him; that individual's height was "5'11 ½." (Tr. Vol. V at 804.)

{¶ 54} Following deliberations, the jury returned verdicts finding appellant guilty of murder, aggravated robbery, and two counts of kidnapping. The jury found appellant not guilty of aggravated murder. For purposes of sentencing, the trial court merged the kidnapping counts. By entry filed February 27, 2017, the trial court sentenced appellant to 15 years to life as to the murder count, to be served concurrently to a 10-year sentence for aggravated robbery, and a 10-year sentence for kidnapping.

{¶ 55} On appeal, appellant sets forth the following six assignments of error for this court's review:

> [I.] THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW CONTRARY TO THE OHIO AND UNITED STATES CONSTITUTIONS BY ADMITTING REPETITIVE, GRUESOME PHOTOGRAPHS OF THE DECEASED.
>
> [II.] THE ADMISSION OF OTHER ACTS TESTIMONY VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.
>
> [III.] APPELLANT WAS DENIED HIS RIGHTS TO A FAIR TRIAL, TO COUNSEL, TO PRESENT A DEFENSE, AND TO DUE PROCESS CONTRARY TO THE OHIO AND UNITED STATES CONSTITUTIONS WHEN THE TRIAL COURT ORDERED APPELLANT TO WEAR RESTRAINTS WITHOUT ADEQUATE JUSTIFICATION.
>
> [IV.] APPELLANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW BY THE INTRODUCTION OF INADMISSIBLE COMMUNITY AND VICTIM IMPACT EVIDENCE.
>
> [V.] APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.
>
> [VI.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION

OF APPELLANT'S RIGHTS UNDER THE UNITED STATES
AND OHIO CONSTITUTIONS.

{¶ 56} Under the first assignment of error, appellant asserts the trial court erred by admitting repetitive, gruesome photographs of Seff, thereby denying him a fair trial and due process of law. Appellant notes Detective Bair authenticated photographs he took of the crime scene, including a group of 15 pictures shown to the jury depicting Seff either inside the well or laying on the grass after being removed from the well. Further, appellant notes, Detective Green authenticated pictures he took of Seff at the morgue, and an additional 40 pictures were shown to the jury and admitted into evidence. Appellant maintains only a few photographs were necessary, and that the number of photographs admitted before the jury prejudiced him.

{¶ 57} In response, the state argues the prosecutor worked with defense counsel to limit the number of photographs admitted at trial, and several photographs were withdrawn at defense counsel's request. The state further argues defense counsel did not object to the admission of photographs of Seff's body at the crime scene or the morgue and, therefore, plain error is the appropriate review on appeal.

{¶ 58} In general, "[d]ecisions on the admissibility of photographs are 'left to the sound discretion of the trial court.' " *State v. Gonzalez*, 7th Dist. No. 06 MA 58, 2008-Ohio-2749, ¶ 34, quoting *State v. Slagle*, 65 Ohio St.3d 597, 601 (1992). In this respect, "[t]he test for exclusion of evidence under Evid.R. 403 is that relevant evidence, including photographic evidence, should only be excluded when, 'its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.' " *Id. See also State v. Jones,* 7th Dist. No. 12 MA 181, 2013-Ohio-5915, ¶ 77 ("in a noncapital case * * * the admission of potentially prejudicial photographs is determined under a discretionary balancing test that requires exclusion only if the probative value of the photographs is substantially outweighed by the danger of unfair prejudice").

{¶ 59} A review of the record indicates defense counsel raised "no objection" to state's exhibit Nos. B1 through B63, including the 15 photographs of Seff, nor did defense counsel object to state's exhibit Nos. C1 through C47, the morgue photographs. (Tr. Vol. IV at 646.) However, before the photographs were submitted to the jury, defense counsel requested the court to limit "the more gruesome photographs" with respect to state's

exhibit Nos. C1 through C47 (an issue initially the subject of a pre-trial motion in limine). (Tr. Vol. V at 905.)   In response, the prosecutor stated, based on defense counsel's "request with our agreement and at the court's discretion, we will withdraw State's Exhibits C32, C43, C44, C45, C46, and C47." (Tr. Vol. V at 907.)   The prosecutor noted that the withdrawn exhibits "are photographs taken at the morgue by the crime scene unit." (Tr. Vol. V at 907.)   Finally, we note the coroner's autopsy photographs (state's exhibit Nos. E1 through E15) were not admitted into evidence.

{¶ 60} Based on the record presented, appellant has arguably waived all but plain error with respect to the admission of the photographs.   In accordance with Evid.R. 103(A), "a party's failure to object to the admission of evidence at trial constitutes a waiver of all but plain error on appeal." *State v. Mills*, 5th Dist. No. 2007 AP 07 0039, 2009-Ohio-1849, ¶ 131.   Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Under Ohio law, "[p]lain error must be obvious as well as outcome-determinative." *State v. Frazier,* 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 37.   Thus, "plain error occurs only when, but for the error, the outcome of the trial clearly would have been different." *Id.*

{¶ 61} As observed by the state, appellant does not specifically identify which photographs he contends should have been excluded as unfairly prejudicial.   The Supreme Court of Ohio "has held that ' "the mere fact that [a photograph] is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury." ' " *State v. Williams*, 2d Dist. No. 24548, 2012-Ohio-4179, ¶ 46, quoting *State v. Frazier*, 61 Ohio St.3d 247, 252 (1991), quoting *State v. Woodards*, 6 Ohio St.2d 14, 25 (1966).   In this respect, "[s]uch photographs may help illustrate witness testimony and forensic evidence, or show the nature and circumstances of the crime." *Williams. See also State v. Biros*, 78 Ohio St.3d 426, 445 (1997) (although gruesome, photographs of the victim's body were probative "of contested issues of intent, purpose, motive, and the cause, manner and circumstances of the victim's death").

{¶ 62} In the present case, the photographs were relevant to the issues of intent, and to supplement the testimony of Dr. Fardal, who utilized the photographs to reach a

determination as to cause and time of death. As noted under the facts, Seff's body was first discovered (and Seff pronounced dead) on July 9, 2008. Dr. Fardal testified, however, that in his estimation, Seff "had been dead four to five days prior." Dr. Fardal based his estimate on factors including "discoloration of her face," and "skin slippage on her hand." (Tr. Vol. III at 504.)

{¶ 63} As to the issue of cause of death, Dr. Fardal observed "ligature around her neck." (Tr. Vol. III at 505-06.) Specifically, he stated, "[f]rom the photographs among those views, it was knotted on the right side of her neck. It was tied around her neck." (Tr. Vol. III at 506.) The state argues, and we agree, that the photographs had particular probative value to the issue of cause of death given the state of decomposition. On this point, Dr. Fardal noted, due to decomposition of Seff's body, he was unable to observe petechial hemorrhages (common in instances of strangulation), "so all we have is this cloth about her neck that's knotted on the right side, and it looks as a ligature strangulation type of death." (Tr. at Vol. III at 506-07.)

{¶ 64} As indicated above, prior to jury deliberations, defense counsel expressed his "understanding" to the trial court that "the more gruesome photographs" would be excluded. (Tr. Vol. V at 905.) The state then withdrew six of the photographs taken at the morgue. On review, we find the remaining photographs had probative value. At trial, defense counsel emphasized the lack of physical evidence at the crime scene. Given the decomposed condition of the body, the photographs were relevant to the state's case and they assisted the jury in understanding the testimony of the coroner as to the cause of death (ligature strangulation) and date of death. *See State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 83 (although gruesome, autopsy photos "illustrated the coroner's testimony on cause of death and were probative of issues of intent"). *See also State v. Mason,* 82 Ohio St.3d 144, 159 (1998) (photographs of body admissible as "they illustrate the testimony of the coroner"). The photographs also provided context for the testimony of other witnesses, including police investigators, and we do not find them unnecessarily repetitive or cumulative. Here, the trial court could have reasonably concluded the photographs were relevant, and that their probative value was not substantially outweighed by the danger of unfair prejudice. Accordingly, appellant has failed to

demonstrate the trial court committed an abuse of discretion, let alone plain error, with respect to the admission of the photographs.

{¶ 65} Based on the foregoing, appellant's first assignment of error is not well-taken and is overruled.

{¶ 66} Under the second assignment of error, appellant asserts the trial court erred in admitting other acts evidence during the testimony of Jenkins. Specifically, appellant cites testimony by Jenkins, initially elicited during cross-examination, that she used cocaine with appellant. Appellant contends the state improperly explored that issue on redirect examination.

{¶ 67} In response, the state argues that defense counsel, during cross-examination of Jenkins, did not move to strike her statement that she used cocaine with appellant; rather, counsel continued to question Jenkins about her drug usage. The state further argues that defense counsel did not object to the prosecution's initial line of questioning on redirect examination regarding drug use, and only raised an objection after Jenkins testified appellant preferred crack and that he was jumpy when he used that drug.

{¶ 68} The record indicates defense counsel inquired of Jenkins on cross-examination: "Ms. Jenkins, back in 2008, you were using crack cocaine, am I correct." (Tr. Vol. II at 276.) Jenkins acknowledged she had used cocaine. When asked if she used cocaine powder or crack cocaine more often, Jenkins responded: "Cocaine with Charles Greene." (Tr. Vol. II at 278.) Defense counsel also questioned Jenkins as to whether she was "high" on July 5, 2008, and Jenkins responded: "No, I was trying - - me and Charles Greene was trying that day for sure, I know. * * * But we couldn't come up with no money or no drugs." (Tr. Vol. II at 293.)

{¶ 69} On redirect examination, the prosecutor inquired of Jenkins: "[R]ight around July 5, 2008, who were you using crack cocaine or powder cocaine with back then?" Jenkins responded: "Charles Greene." (Tr. Vol. II at 308.) When asked, over objection, whether appellant preferred powder or crack cocaine, Jenkins responded that "[c]rack" was "all we did together." When asked if appellant appeared to be more alert when he used crack cocaine, Jenkins responded: "He was jumpy, like spaced out sometimes." (Tr. Vol. II at 310.)

{¶ 70} Following Jenkins' testimony, defense counsel moved for a mistrial as to "the testimony that was elicited on recross concerning allegations of Mr. Greene's drug use." (Tr. Vol. II at 328.) Defense counsel argued the state "did not give notice of its intent to use any allegations of any bad act." (Tr. Vol. II at 329.)

{¶ 71} In response, the prosecutor argued that defense counsel "raised the door to it. We did not raise that subject. Not once in her direct testimony did she say anything about the defendant's drug use, nor were there any questions asked that alluded to that or would have elicited that. It was [defense counsel's] question that brought it out." (Tr. Vol. II at 329-30.)

{¶ 72} The trial court denied the motion for mistrial, but noted it would provide a jury instruction indicating the jury "cannot consider any other acts of the defendant." (Tr. Vol. II at 333.) The court subsequently provided an instruction on that issue. The trial court also ruled the state was precluded from arguing that appellant's drug usage was a motivation for the crime.

{¶ 73} In general, "[t]he admission and exclusion of evidence are within the broad discretion of the trial court." *State v. Hammons*, 12th Dist. No. CA2004-01-008, 2005-Ohio-1409, ¶ 8, citing *State v. Mays*, 108 Ohio App.3d 598, 617 (8th Dist.1996). Evid.R. 404(B) states in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 74} Under Ohio law, "[e]vidence of a defendant's prior bad acts is inadmissible to show that the defendant has a propensity or inclination to commit the offense in question." *Hammons* at ¶ 9, citing Evid.R. 404(B). However, "[p]rejudicial error will not be found * * * when the defense 'opens the door' to this evidence." *State v. Moore*, 8th Dist. No. 80416, 2003-Ohio-1154, ¶ 23, citing *State v. Greer,* 39 Ohio St.3d 236, 243 (1988). *See also Hammons* at ¶ 9, citing *State v. Hartford*, 21 Ohio App.3d 29, 30-31 (8th Dist.1984) ("where evidence of a defendant's prior bad acts is first introduced or brought out by the defense, objection to such evidence is waived and there is no reversible error"); *State v. Brooks,* 9th Dist. No. 07 CA 0111-M, 2008-Ohio-3723, ¶ 53 (while introduction of

other acts testimony is generally prohibited, "courts will not find prejudicial error when the defense 'opens the door' to such evidence").

{¶ 75} In the present case, information regarding appellant's drug use first arose during defense counsel's questioning of Jenkins on cross-examination, and the trial court could have reasonably concluded the defense opened the door to the testimony at issue. *See State v. Dennis,* 10th Dist. No. 05AP-1290, 2006-Ohio-5777, ¶ 34 ("Because defendant initially elicited the prejudicial evidence, he effectively waived his right to contest its admissibility, and thus the court did not abuse its discretion by admitting such evidence."); *State v. Herron,* 8th Dist. No. 99110, 2013-Ohio-3139, ¶ 25 (Where the record demonstrates defense counsel's "questions of the witnesses 'opened the door' to the evidence he now challenges, neither Evid.R. 403(A) nor 404(B) avail him."). Accordingly, we find no abuse of discretion by the trial court in admitting the testimony at issue.

{¶ 76} However, even assuming the evidence was inadmissible, we note the trial court "minimized any potential prejudice" by providing a limiting instruction to the jury. *State v. Powih,* 12th Dist. No. CA2016-11-023, 2017-Ohio-7208, ¶ 27-28. Specifically, the trial court instructed the jury that it could not consider evidence of other crimes "to prove the character of the defendant in order to show that he acted in accordance with that character." (Tr. Vol. V at 878.) It is "presumed the jury followed those instructions." *State v. Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 23. As also noted, the trial court precluded the state from arguing that drug use was a motivation for the crime, and we further note the jury acquitted appellant of the most serious offense (aggravated murder).

{¶ 77} Appellant's second assignment of error is not well-taken and is overruled.

{¶ 78} Under the third assignment of error, appellant argues he was denied the right to a fair trial and due process when the court ordered him to wear leg restraints throughout the trial without adequate justification. Appellant argues the trial court never made any findings justifying the use of leg irons, nor did the court conduct a hearing to consider evidence on the need for such restraints.

{¶ 79} A criminal defendant in a jury trial "has the right to remain free of physical restraints that are visible to the jurors." *State v. Jackson,* 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 153, citing *Deck v. Missouri,* 544 U.S. 622, 628-29 (2005). That right, however,

"may be overcome in a particular instance by the need for physical security, escape prevention, or courtroom decorum." *Id.*, citing *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 79. Further, "[t]he decision to impose such a restraint is left to the sound discretion of the trial court." *Id.*, citing *State v. Richey*, 64 Ohio St.3d 353, 358 (1992).

{¶ 80} In the present case, prior to voir dire and outside the presence of the jury, the following colloquy took place between defense counsel and the trial court:

> [DEFENSE COUNSEL]: Okay. Your Honor, please, I would ask permission to have the handcuffs removed from Mr. Greene. He does have leg irons on. So, I think that's sufficient security for these proceedings.
>
> THE COURT: Okay. They can be removed.

(Tr. Vol. I at 28.)

{¶ 81} Thus, the record indicates defense counsel did not object to the use of leg restraints (i.e., only requesting the handcuffs be removed and stating that the use of leg irons was "sufficient security for these proceedings"). (Tr. Vol. I at 28.) We therefore apply plain error review.

{¶ 82} As indicated, appellant challenges the trial court's decision to permit leg restraints without first conducting a hearing. We note, however, while "the Supreme Court of Ohio encourages trial courts to hold a hearing on the matter * * * the court has never required a hearing." *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 17, citing *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914. *See also Jackson* 2014-Ohio-3707 at ¶ 153, quoting *Franklin* at ¶ 82 ("while 'the preferred and encouraged practice prior to handcuffing a defendant during any phase of trial is to hold a hearing on the matter, we do not find this to be an absolute rule' "). Rather, " '[w]here the facts and circumstances surrounding a defendant illustrate a compelling need to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it.' " *Boone* at ¶ 17, quoting *Franklin* at ¶ 82. Accordingly, "there is no per se error because the trial court did not hold a hearing to address its security concerns." *Boone* at ¶ 17.

{¶ 83} In the present case, appellant does not identify anything in the record indicating the shackles were visible to the jury, and this court's review has found nothing

to suggest the jury was aware of the leg restraints. Under Ohio law, "a defendant, tried in restraints, 'cannot establish any resulting prejudice, [where] nothing shows that the leg restraints were visible to the jury.' " *State v. Locke*, 11th Dist. No. 2014-L-053, 2015-Ohio-1067, ¶ 121, quoting *Neyland* at ¶ 114. Further, the record contains no indication the use of leg restraints interfered with appellant's ability to communicate with defense counsel or to testify on his own behalf. Thus, even accepting the trial court erred in its decision, appellant cannot show such error affected the outcome of the proceedings.

{¶ 84} Appellant's third assignment of error is not well-taken and is overruled.

{¶ 85} Under the fourth assignment of error, appellant asserts it was error for the trial court to introduce victim-impact evidence. Specifically, appellant argues the state introduced such evidence through the testimony of Fisher, who testified that Seff was a close friend of her family, and Seff treated her tenants like family. Appellant maintains there was no proper purpose for the introduction of this testimony, the clear import of which was to gain sympathy for Seff and prejudice to appellant.

{¶ 86} We have previously noted that the admission of evidence lies within the discretion of the trial court. *Hammons* at ¶ 8. Further, "a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62.

{¶ 87} The Supreme Court has held "[v]ictim-impact evidence that relates only 'to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family' * * * is generally inadmissible at the trial phase, but such evidence can be admissible if it also 'relat[es] to the facts attendant to the offense.' " *State v. Clinton,* 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 126, quoting *State v. Fautenberry*, 72 Ohio St.3d 435, 440 (1995).

{¶ 88} At trial, Fisher testified she and her mother were close friends of Seff. Fisher related that Seff "carried wads of cash," and earned her living as a landlord of approximately 15 rental properties. (Tr. Vol. II at 216.) Fisher explained Seff had two personal residences, including her home in German Village. Fisher testified as to calls she and her mother made to Seff's cell and home phones over the 2008 Fourth of July weekend after not hearing from her. After Seff's death, Fisher's mother was appointed the executor of Seff's estate, and Fisher assisted her mother in handling estate matters.

Fisher testified as to assisting police in obtaining Seff's bank records, in which it was discovered Seff's credit cards had been used at a local Walmart.

{¶ 89} Here, Fisher's testimony as to her relationship with Seff provided background information about Seff, including details about her personal property, real estate, and proclivity to carry large amounts of cash with her. Fisher's "preliminary testimony" also "laid the foundation" for her testimony as to her ability to assist police investigators in obtaining Seff's bank and credit card records. *See State v. Hartman*, 93 Ohio St.3d 274, 293 (2001). Thus, we find no error by the trial court in admitting such evidence as relevant in "relating to the facts attendant" to the offense. *Fautenberry* at 440.

{¶ 90} We do note the questionable relevancy of the prosecutor's inquiry, during the direct examination of Fisher, as to the demeanor of Seff's tenants on learning of her death. We further note, however, the trial court limited this line of inquiry to "one question." (Tr. Vol. II at 221.) On review, we find "no reasonable probability" that this single inquiry and response affected the outcome of the trial. *See State v. F.R.*, 10th Dist. No. 14AP-440, 2015-Ohio-1914, ¶ 48 (finding "no reasonable possibility that the limited victim impact testimony contributed to appellant's conviction").

{¶ 91} Appellant's fourth assignment of error is not well-taken and is overruled.

{¶ 92} Under the fifth assignment of error, appellant contends he was denied effective assistance of counsel. Specifically, appellant argues his counsel was deficient based on: (1) introduction of crime scene and morgue photographs of Seff's body, (2) failure to object or request a hearing on the use of leg irons, (3) failure to object when evidence of appellant's status as a suspect in other crimes was elicited, and (4) the cumulative effect of counsel's errors.

{¶ 93} In order to prevail on a claim of ineffective assistance of counsel, appellant must satisfy the "two-prong test" under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *State v. Carter*, 10th Dist. No. 03AP-778, 2005-Ohio-291, ¶ 26. First, appellant must demonstrate that counsel's performance was "deficient," requiring a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Under the second prong of the *Strickland* test, appellant must demonstrate that counsel's deficient performance

"prejudiced the defense," which requires a "showing that but for counsel's unprofessional errors, a reasonable probability existed that the result of the trial would have been different." *Id.* at ¶ 27.

{¶ 94} Appellant first contends his counsel was ineffective in failing to object to introduction of the crime scene and morgue photographs. Appellant contends (as he did under the first assignment of error) the number of photographs admitted was prejudicial.

{¶ 95} On review, we do not find deficient performance by counsel as to this issue. The record indicates defense counsel filed a motion in limine prior to trial seeking to exclude the more gruesome photographs taken at the crime scene and morgue. The record also supports the state's contention that defense counsel worked with the prosecution to limit the number of photographs at trial, and the prosecution agreed to withdraw six of the morgue photographs during the proceedings. The record also reflects the coroner's autopsy photographs were not provided to the jury. Further, in addressing appellant's first assignment of error, we found no abuse of discretion by the trial court in admitting the photographs at issue based on their probative value. Accordingly, appellant has shown neither deficient performance nor resulting prejudice.

{¶ 96} Appellant next contends trial counsel was deficient in failing to object to or request a hearing on the use of leg irons. We have previously determined, however, in addressing appellant's third assignment of error, nothing in the record indicates the jury was aware of the leg restraints. Accordingly, even if he could show deficient performance, appellant cannot demonstrate prejudice under the second prong of *Strickland.*

{¶ 97} Appellant's final claim of ineffective assistance involves the deposition testimony of DNA expert Tejwani. Appellant argues that, during that testimony, Tejwani stated appellant's DNA was matched with a swab of DNA taken from Seff's vehicle due to a match to appellant found in "CODIS." (Tr. Vol. III at 395.) Appellant cites testimony by Tejwani that "CODIS stands for Combined DNA Index System," which contains profiles from "known suspects." (Tr. Vol. III at 395.) Appellant contends the introduction of this testimony permitted the jury to know appellant was already in the system due to a prior felony conviction "of some kind." (Appellant's Brief at 30.)

{¶ 98} In response, the state argues there was no basis for an objection. The state maintains the use of the terminology "known suspect" means only a suspicion of a crime,

not an actual conviction, and that any facts regarding convictions were not before the jury. The state further argues that Tejwani's description of CODIS was relevant and accurate, reflecting the generally accepted purpose of the database, which is to identify unknown profiles obtained from evidence.

{¶ 99}   At the outset, we agree with the state that the source of the DNA match was relevant to explain the timeline in the case, including how investigators, subsequent to 2008, obtained appellant's DNA profile and matched it to samples from Seff's vehicle. More significantly, we agree with the state that the reference to "known suspects" did not necessarily imply to the jury appellant was a convicted offender, especially in the absence of any facts as to how his profile may have been entered into the database. *See, e.g., People v. Harland,* 251 P.3d 515, 517-18 (Colo.2010) (trial court did not err in permitting agent to testify that defendant's DNA profile was in database where agent did not testify as to how defendant's DNA came to be in database and no evidence was presented that defendant engaged in any prior criminal activity).   Thus, while we find unpersuasive appellant's claim that trial counsel was deficient in failing to raise an objection, we find no reasonable probability that the result of the proceeding would have been different had counsel objected.

{¶ 100} Appellant also argues that the cumulative effect of counsel's errors resulted in a denial of due process.  However, in order to show cumulative error, there must be a showing of multiple errors to cumulate, and "[w]here no individual, prejudicial error has been shown, there can be no cumulative error." *State v. Jones,* 2d Dist. No. 20349, 2005-Ohio-1208, ¶ 66.

{¶ 101} Based on the foregoing, appellant's fifth assignment of error is not well-taken and is overruled.

{¶ 102}   Under the sixth assignment of error, appellant challenges his convictions as against the manifest weight of the evidence.  Appellant contends the jury obviously did not believe all of the testimony of Jenkins and Johnson, as it acquitted him of aggravated murder, i.e., the jury did not believe appellant purposely caused the death of Seff while committing or attempting to commit aggravated robbery or kidnapping.   Appellant further argues there were no witnesses to the killing and no physical evidence placing him at the scene.

{¶ 103} In considering whether a conviction is against the manifest weight of the evidence, an appellate court is required to "review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses." *State v. Bandy*, 1st Dist. No. C-160402, 2017-Ohio-5593, ¶ 55, citing *State v. Thompson*, 78 Ohio St.3d 380, 387 (1997). The issue in "reviewing such a claim is whether in resolving conflicts in the evidence, and in rejecting [a defendant's] defenses, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 104} At the outset, appellant's contention that the jury's acquittal on aggravated murder indicates his convictions on other counts are against the manifest weight of the evidence is not persuasive, as reviewing courts generally "decline to speculate that a mixed verdict is 'attributed solely to the jury's insecurity, confusion, or doubts as to the adequacy of evidence.' " *State v. Washington*, 10th Dist. No. 09AP-424, 2009-Ohio-6665, ¶ 24, quoting *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, ¶ 16 (10th Dist.). *See also State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 291 ("it is not for an appellate court to speculate about why a jury decided as it did").

{¶ 105} As noted, the jury returned verdicts finding appellant guilty of murder, aggravated robbery, and kidnapping. R.C. 2903.02(B) defines the offense of murder in part as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." R.C. 2911.01(A) sets forth the offense of aggravated robbery, and states in part: "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt to inflict, serious physical harm on another."

{¶ 106} The offense of kidnapping is defined under R.C. 2905.01 in part as follows:

> (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;

(3) To terrorize, or to inflict serious physical harm on the victim or another;

\* \* \*

(B) No person, by force, threat, or deception \* \* \* shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim \* \* \*:

(1) Remove another from the place where the other person is found;

(2) Restrain another of the other person's liberty.

{¶ 107} The state's general theory of the case, as articulated during closing argument, was that Seff, upon leaving the tool rental store with hedge trimmers around noon on July 5, 2008, received a call from appellant at 1:28 p.m., presumably to arrange for work. The prosecutor, citing testimony by Jenkins that she observed Seff pick appellant up that afternoon, theorized appellant used the hedge trimmers (never recovered as evidence) to strike Seff, causing the blood splatter on the fence; appellant then bound Seff's wrists, wrapped a shirt around her head, knotted a ligature around her throat, and forced her body inside the decorative well. A short time later, appellant was in possession of Seff's cell phone and credit cards.

{¶ 108} At trial, the state presented testimony that Seff was known to carry large amounts of cash on her person. Approximately two weeks before Seff's death, appellant contacted Jenkins and asked her to "act like [she] was paying [Seff] rent and push her down and rob her." (Tr. Vol. II at 252.) Jenkins refused appellant's request. Approximately one week before Seff's death, Johnson observed appellant at Seff's residence on South High Street, the location where Seff's body was found on July 9, 2008. The state introduced a receipt prepared by Seff indicating she paid appellant $50 on July 1, 2008.

{¶ 109} On July 5, 2008, the last day Seff was observed alive, Seff took hedge trimmers to a tool rental store for sharpening. She left the store at 12:04 p.m. The state presented phone records indicating appellant phoned Seff a short time later, at 12:29 p.m. Appellant again phoned Seff at 1:28 p.m. Appellant acknowledged making the calls.

Jenkins testified she observed Seff pick appellant up that day in her vehicle.  By 2:46 p.m. that same afternoon, appellant was in possession of Seff's cell phone.

{¶ 110} Appellant placed calls to Jenkins that day from Seff's phone.  During the evening of July 5, 2008, appellant was also placing calls on Seff's phone to Greathouse.  Over a three-day period, from the afternoon of July 5 through the evening of July 8, 2008, at least 47 calls were made from Seff's cell phone to either Jenkins or Greathouse.  The jury heard testimony indicating appellant provided varying accounts of how he came into possession of Seff's phone.  Appellant initially told Jenkins that Seff gave him the phone, but later told Jenkins he obtained the phone by breaking into Seff's home after learning she had died.  Appellant told Greathouse he had found Seff's phone.

{¶ 111}  On July 6, 2008, Greathouse and another individual were utilizing Seff's credit cards to make purchases at various stores.  Greathouse testified she obtained the cards from appellant.  Jenkins testified appellant asked her to use Seff's "Lowe's card," but she refused.  (Tr. Vol. II at 260.)  Appellant's DNA was present inside Seff's vehicle on the steering wheel and the driver's side arm rest.

{¶ 112}  On July 9, 2008, Seff's body was discovered upside down in a decorative wishing well outside her residence on South High Street.  Dr. Fardal opined Seff had been dead four to five days prior to the autopsy (on July 10, 2008).  Seff's hands were tied with duct tape, and Dr. Fardal concluded the cause of death was ligature strangulation.

{¶ 113}  Appellant testified on his own behalf, denying any involvement in Seff's death.  Appellant stated he obtained Seff's cell phone and credit cards from a "white guy." (Tr. Vol. IV at 683.)  Appellant claimed he did not look at the cards to know they belonged to Seff.  Appellant denied ever driving Seff's vehicle, and also denied asking Jenkins to set up a robbery for him.

{¶ 114} Appellant acknowledged signing Seff's receipt book on July 1, 2008 indicating he performed work for her.  He also acknowledged that he lied to detectives when he told them Seff never paid him more than $30 at a time.  Despite numerous witnesses testifying about Seff's habit of carrying large amounts of cash, appellant testified he "never" observed Seff "with a wad of money."  (Tr. Vol. IV at 699.)  Appellant acknowledged calling Seff on July 5, 2008 at 1:28 p.m., explaining: "I guess I was probably calling Alyce for work or something.  I don't know."  (Tr. Vol. IV at 721.)  When

asked if he lied to detectives by denying he possessed Seff's phone, appellant stated: "I guess it was. Yes it was." (Tr. Vol. IV at 729.) In contrast to the testimony of Johnson, who stated she observed appellant at Seff's residence on South High Street approximately one week prior to Seff's death, appellant denied he had ever been to that location.

{¶ 115} While appellant challenges the credibility of Jenkins and Johnson, the jury was "free to believe or disbelieve all or any of the testimony." *State v. Sevilla,* 10th Dist. No. 06AP-954, 2007-Ohio-2789, ¶ 13. In this respect, the trier of fact was "in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *Id.* The jury was also in the best position to consider the credibility of appellant's testimony, and was free to reject his version of the events. Under Ohio law, a conviction is not against the manifest weight of the evidence "because the trier of fact believed the state's version of events over the defendant's version." *State v. Rankin,* 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29. Ultimately, "inconsistencies between defendant's testimony and that of the state's witnesses, were the jury's to resolve." *Id.* at ¶ 32.

{¶ 116} Appellant's claim that the lack of physical evidence at the crime scene undermines the jury's verdict is not persuasive. This court has previously noted that "a lack of physical evidence alone does [not] render a conviction against the manifest weight of the evidence." *State v. Shedwick,* 10th Dist. No. 11AP-709, 2012-Ohio-2270, ¶ 32, citing *State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 20. *See also State v. Henderson,* 9th Dist. No. 27078, 2014-Ohio-5782, ¶ 31 ("lack of physical evidence is not dispositive, but merely a factor for the jury to weigh"). At trial, counsel for appellant emphasized to the jury the lack of physical evidence from the crime scene. The absence of physical evidence in this case was addressed by the state's witnesses, attributed in large part to the fact Seff's decomposed body was not discovered until at least four days after the homicide. Despite the lack of physical evidence from the scene, the state presented other sufficient evidence which, if believed, supported the convictions.

{¶ 117} Based on this court's review of the testimony and evidence presented, we conclude the jury did not clearly lose its way and create a manifest miscarriage of justice in finding appellant guilty of the offenses. Accordingly, we find appellant's convictions for

murder, aggravated robbery, and kidnapping were not against the manifest weight of the evidence.

{¶ 118}   Accordingly, we overrule appellant's sixth assignment of error.

{¶ 119}   Based on the foregoing, appellant's six assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

SADLER and DORRIAN, JJ., concur.

_____