[Cite as *State v. Roundtree*, 2021-Ohio-3825.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 20AP-157 |
| | | (C.P.C. No. 18CR-1669) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Warriayre Roundtree, | : | |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on October 28, 2021

---

**On brief**: *G. Gary Tyack*, Prosecuting Attorney, and *Mark R. Wilson*, for appellee.

**On brief**: *Yeura R. Venters*, Public Defender, and *Ian J. Jones*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Warriayre Roundtree, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of aggravated murder, murder, aggravated robbery, tampering with evidence, and having a weapon while under disability.

{¶ 2} On April 6, 2018, appellant was indicted on one count of kidnapping, in violation of R.C. 2905.10, one count of aggravated robbery, in violation of R.C. 2911.01, two counts of aggravated murder, in violation of R.C. 2903.03, two counts of murder, in violation of R.C. 2903.02, one count of tampering with evidence, in violation of R.C. 2921.12, and one count of having a weapon while under disability, in violation of R.C.

2923.13.  All of the counts, except for the weapon under disability count, included firearm specifications.

{¶ 3}   The matter came for trial before a jury beginning December 10, 2017.  Julius Lancaster, a business owner, has office space located at 2169 James Road, Columbus, Ohio.  On Sunday morning, January 8, 2017, Lancaster arrived at his office at approximately 9:00 a.m. and observed the body of an "African-American man" outside the building with an apparent gunshot wound.  (Tr. at 195.)  He immediately dialed 911.

{¶ 4}   On January 8, 2017, Columbus Police Officer Kenneth Kerr received a dispatch reporting an individual found lying in a grassy area near 2169 James Road.   Upon arrival, the officer observed a male lying in the grass, "wearing a sweatshirt, jeans and boots."  The individual "appeared to be dead," and had "a layer of ice or frost over the exposed skin parts of his body."  (Tr. at 168.)   The body was found in an "industrial area," with "a lot of warehouses and businesses off of the service road," located "very close to the freeway."  (Tr. at 174.)   The officer called for medical personnel and the victim, later identified as Savaughn Conner, was pronounced dead at the scene.

{¶ 5}   At trial, Columbus Police Detective Donald Jones, a member of the department's crime scene search unit, identified photographs taken at appellant's residence, located on Gimbles Drive, Columbus, following execution of a search warrant.  The photographs included pictures depicting a Chevy Tahoe located in the garage.  Detective Jones identified several firearms discovered inside the residence, including a 9 mm handgun with 26 live rounds located under a television stand.  That weapon had an "extended magazine," capable of holding "more rounds."  (Tr. at 252.)  Members of the search unit also discovered a .45-caliber pistol in a kitchen cabinet.

{¶ 6}   In January 2017, Steven Walker resided on Minnesota Avenue.  The shooting victim, Conner, also resided at Walker's residence, having stayed there the past "four to six months." According to Walker, Conner made money "running checks."  (Tr. at 273.) Walker testified that Conner "would get a fake company name, have a check printed up in that company [name] and try to cash them."  (Tr. at 273-74.)   Others involved in the check cashing scheme were "a girl named Danielle and a dude named Dub."  (Tr. at 274.)  Dub was "Puerto Rican and black."   (Tr. at 275.)   At trial, Walker identified appellant as the individual he knew as Dub.   Walker, who had previously been in appellant's vehicle,

testified appellant "gave me a couple rides. He actually took us a couple times on one or two of the runs." (Tr. at 274.)

{¶ 7} On the evening of January 7, 2017, Walker and Conner were at their residence on Minnesota Avenue. Connor told Walker that "Dub and them is coming to get me. We're about to go on High Street." Conner "said they were going to have a drink and talk to some girls." (Tr. at 280.) Walker observed Conner answer his cell phone, and Conner stated: " 'Dub and them are outside. I'm about to leave.' " (Tr. at 281.) Walker saw Conner get inside the same SUV he had previously ridden in with appellant and Conner. Walker testified that Conner had his cell phone with him when he left that evening. The next morning, Walker learned Conner was deceased.

{¶ 8} Columbus Police Detective Kevin Jackson is a member of the department's crime scene search unit and is assigned to the "Franklin County Coroner's Office as a morgue liaison." (Tr. at 288.) On January 9, 2017, Detective Jackson collected evidence at the morgue from the shooting victim. At trial, he identified photographs "depicting the body of Savaughn Conner at the coroner's office at the time his body was processed." (Tr. at 294.) On January 10, 2017, Detective Jackson returned to the morgue and collected three spent projectiles recovered from the victim's body. A fourth spent projectile was also given to him "in the belief that this item may belong with this same case since it was found and located within the same procedure room." (Tr. at 313.) The detective did not recover a cell phone from the victim.

{¶ 9} Danielle Seals testified she met Conner in 2015 through a mutual friend. Conner introduced her to cashing fake checks. Conner "called my mutual friend and let her know that he had some checks that his friend wanted cashed. Once the checks were cashed, I would get my portion and they would get their portion." (Tr. at 342-43.) On several occasions, she went with Conner and another individual, who "[w]e called * * * Doug," to cash checks. (Tr. at 343.) Seals stated that Doug "was the one that had the checks." (Tr. at 344.) Doug "was kind of stocky, five-eleven, light skin." (Tr. at 343.) At trial, Seals identified appellant as the individual known as Doug.

{¶ 10} During these check cashing trips, appellant was the driver; Seals described the vehicle used on these trips as an "SUV, Tahoe four-door, navy blue." Appellant would arrive at Seals' residence, picking her up "in that same truck." (Tr. at 345.) Appellant would

drive Seals to a check cashing location, and she would go inside "and present the check." Once she returned to the vehicle, Seals would hand the cash to Conner, who would then "give it to Doug, and Doug would divvy out my portion and Vaughn's portion." (Tr. at 346.) On cross-examination, Seals acknowledged she had a forgery conviction.

{¶ 11} Jennifer Coreus testified she was in a dating relationship with Conner. On the evening of January 7, 2017, Coreus was in Detroit with a friend; she spoke to Conner on the phone that day, and he texted her later that evening. The last text she received from Conner was on that date.

{¶ 12} At trial, Phillip Crowder, an investigator with the Ohio Bureau of Motor Vehicles, identified plaintiff-appellee, State of Ohio's, Exhibit L as a "Record Request Certification for a vehicle registration." (Tr. at 370.) The vehicle registration abstract listed "Warriayre Roundtree" as the primary owner of a 2005 Chevrolet SUV, with a purchase date of November 22, 2015.

{¶ 13} David Loomis, a state forensic analyst, testified that his duties include processing "audio and video cases" from across the state, including "audio and video clarification for the purpose of investigation and for court presentation." (Tr. at 387.) On January 17, 2017, Loomis received video evidence from Columbus Police Detective Melissa Carlson for analysis. During his testimony, the state played enhanced video clips from the materials submitted by Detective Carlson.

{¶ 14} R. S. is currently incarcerated in federal prison for wire fraud and conspiracy to commit wire fraud. R.S. was offered a deal to testify in the instant case, reducing his sentence by a total of 24 months to a sentence of 112 months.

{¶ 15} R.S. testified that on March 28, 2017, while awaiting federal arraignment, he was incarcerated at the Franklin County Corrections Center, located at 2460 Jackson Pike, Columbus. He remained at that facility, also known as "the workhouse," until August 10, 2017. (Tr. at 413.)

{¶ 16} R.S. was housed in "the pod" designated "2-west-6." (Tr. at 425.) The first part of the pod "is an open area with a bench and TV," while the "second part has bunk beds" to accommodate approximately 25 inmates. (Tr. at 426.) The sleeping area is also an open room layout. Upon arriving at the facility, R.S. was provided a "mat" and he found an open "upper bunk" bed located "in the middle of the sleeping area." (Tr. at 427.) The

next day, R.S. learned that the individual in the lower bunk was appellant.  At trial, R.S. identified appellant as the individual he met at the workhouse.  Appellant remained at the facility during the entire time R.S. was there.

{¶ 17}  R.S. eventually moved to the lower bunk, and appellant occupied a lower bunk next to him.  R.S. estimated his bunk was approximately three feet in distance from appellant's bunk.  While at the facility, R.S. overheard conversations appellant had with other inmates, including Miles Jackson, Jarrell Cumberland, and John Durham.  R.S. described these individuals as all "Blood" gang members.  (Tr. at 433.)

{¶ 18}  One morning, between approximately 2:30 and 3:00 a.m., R.S. overheard a conversation between Jackson and appellant.  Jackson was telling appellant "about one night he was up north, and he went to go kill somebody," and he was "trying to locate in the house where the guy was."  (Tr. at 436.)  R.S. testified that, during the conversation, appellant "asked Miles, '[d]id you have your cellphone on you when you went there?' "  (Tr. at 437.)  Jackson responded affirmatively, and appellant "said, '[y]ou're lucky nothing happened, because they could have picked the cellphone tower where you were and placed you at the scene.' "  (Tr. at 438.)

{¶ 19}  Appellant then shifted topics to an incident involving "his cellphone and the way he maneuvered through the cellphone towers so he could trick law enforcement."  (Tr. at 439.)  Appellant "said, '[t]he night that I decided to handle that, me and wifey was at the bar close to our house, and I hid my cellphone up under the tire well of the owner of the bar's car because I knew he was going to be the one there to close.' "  (Tr. at 438.)  R.S. understood appellant to mean the bar owner was going to close the bar, and the owner would "leave around 2:30 or 3:00 o'clock in the morning."  (Tr. at 440.)  Appellant left his cell phone "on the top of the tire, underneath the tire well so nobody would see it, but it would stay in place."  (Tr. at 439-40.)  Appellant "wanted the cellphone towers to ping him at the bar when he was really leaving the bar."  (Tr. at 440.)

{¶ 20}  Appellant stated that "him and his wife drove to their house, which he said was in close proximity of the bar, and he called her cellphone once they got in the driveway."  (Tr. at 441.)  R.S. later learned that appellant's wife was "Brandy Maxwell."  (Tr. at 439.)  Appellant was able to place a call to his wife's phone after they left the bar because he was using a second phone, referred to as a "burner phone."  (Tr. at 441.)  According to R.S., a

burner phone is "a prepaid phone that you can buy at a grocery store or a corner store." (Tr. at 441.) R.S. described it as an "anonymous phone." (Tr. at 442.) Appellant "placed a call from the burner phone in the driveway and called Brandy's phone to make it seem like she was at home." (Tr. at 442.)

{¶ 21} On the date of the events, Conner and appellant had spoken by phone. Conner inquired whether appellant had "a spot for me on the team? Like, can I make some more money with you?" (Tr. at 453.) Appellant "said, 'Let's have a drink, and we can talk about it.' " (Tr. at 455.) That evening, appellant and Maxwell went to pick up Conner. Appellant told Jackson he had " 'decided that I was going to kill [Conner].' " (Tr. at 456.)

{¶ 22} R.S. did not know whether appellant or Maxwell was driving, but they picked up Conner in a "gray [Chevy] Tahoe." (Tr. at 456.) R.S. stated the Tahoe had "a huge box for speakers in the back." (Tr. at 457.) Upon arriving to pick up Conner, appellant "was irritated because [Conner] didn't either come right out or he didn't get right in. He [Conner] was talking to his roommate." (Tr. at 457.) Appellant was "irritated" that Conner "didn't hurry up," and when Conner finally entered the vehicle appellant "turned the music up real loud." (Tr. at 457.) While relating the events to Jackson, appellant "was like, 'Boom, boom, boom, boom, boom. I turned around and shot him five times. I tried to shoot him in the heart because I didn't want to shoot him in the head and mess up my truck.' " (Tr. at 457-58.)

{¶ 23} Appellant told Jackson that, after shooting Conner, "[h]e took him somewhere, and he threw him next to some trash." (Tr. at 458.) Appellant mentioned that "when he pulled into the parking lot, he seen a camera on a wall. So he positioned the truck so that when he was getting out, the camera wouldn't see him." (Tr. at 459.) After removing the body from his vehicle, appellant "said he drove two or three minutes, and he came back because he forgot to get [Conner's] cellphone." (Tr. at 459-60.) Appellant then "went through Conner's pockets because he wanted to get the cellphone." (Tr. at 460.) He took the cellphone from Conner, deleted all the messages between himself and Conner, and left the area with the phone. Appellant "said that he broke the phone, and he threw it away with the gun." (Tr. at 461.)

{¶ 24} Appellant also "mentioned a .38 bullet," and that "it was interchangeable." He explained that ".38 bullets can be shot with a 9 millimeter." Appellant "said, 'I used the

.38 bullets so it would throw the detectives off so they would be looking for a .38.' " (Tr. at 463.)

{¶ 25} Appellant discussed the search of his residence, stating that when the SWAT team came to his house "they found a .38 and a .45 with an extended clip." (Tr. at 463.) Appellant related "[t]here was a Pittsburgh Steelers bag with several ounces of high-grade marijuana and the original clip for the nine-millimeter and maybe an extra clip for the .45." (Tr. at 463-64.) Appellant stated the 9 mm with the extended clip "was supposed to be kept in their room on a nightstand or a TV stand," and the .45-caliber weapon was "somewhere in the kitchen." (Tr. at 464.)

{¶ 26} Appellant also discussed the Chevy Tahoe, and "said, 'I cleaned it for three days straight. I cleaned it multiple times." (Tr. at 464.) Appellant related that, after cleaning it himself, "he had a crackhead come clean it again, and he paid that person to do it because that person was known to do detail work." (Tr. at 464.) Appellant also took the speaker box out of the SUV.

{¶ 27} Another topic appellant discussed involved an "opioid conspiracy." (Tr. at 472.) According to R.S., appellant "was making fake prescriptions and having a woman that worked in a doctor's office give him the DEA number from the doctor that worked at that pain clinic. They would make the prescriptions, and they would recruit people to go into the pharmacy and get these prescriptions filled with 90 Perc 30s, a bunch of other pills." (Tr. at 473-74.) R.S. testified the woman's name was "Monica," and that "[s]he worked at a doctor's office." (Tr. at 474.) R.S. further stated that Conner "would help [appellant] recruit people from the homeless shelter," and he would "take them to CVS, Walgreens, and all they needed to have was an ID, and they would get the prescriptions." (Tr. at 475.)

{¶ 28} At trial, R.S. described several conflicts that arose between appellant and Conner, including the fact appellant "was nervous about [Conner] talking to the feds about what they were doing with the prescriptions." (Tr. at 475.) Further, appellant believed Conner "was also taking the pills as well as helping him sell the pills." (Tr. at 476.) Another issue involved appellant's concern about checks; specifically, appellant "started talking about these checks, that [Conner] had either ran off with the check or didn't come back with

the proper amount of money," leading appellant to "think that he was stealing."  (Tr. at 477.)

{¶ 29} R.S. testified Conner became upset because he thought appellant was not giving him a fair share of the proceeds.  On one occasion, when Conner was riding with appellant, Conner observed appellant "make $60,000," and he knew appellant "had that much money in his house."  Conner "brought back four dudes in a car with bulletproof vests" and they parked on the street where appellant resided.  (Tr. at 478.)  Either appellant or his wife noticed the vehicle, and the robbery did not occur.  Appellant "said, '[t]hat's when I made up my mind that I was going to kill him.' "  Appellant stated Conner "went underground after that. * * * 'He knew what I was going to do, and he went underground. He hid out in North Carolina from the summertime to November.' "  (Tr. at 479.)

{¶ 30} Appellant later learned Conner was back in town.  Conner "called and texted him," and asked: " 'Can I get a spot back on the team?' "  (Tr. at 479.)  According to R.S., appellant "acted like * * * the confrontation or the almost robbery * * * never happened so he could play him into getting him physically in his presence."  (Tr. at 479-80.)

{¶ 31} While at the workhouse, R.S. contacted his attorney about being moved to another facility; he felt his life was in danger "because they knew that I knew about a murder."  (Tr. at 487.)  R.S. subsequently spoke with a federal prosecutor and signed a "proffered statement."  (Tr. at 418.)  He was later transferred to another county jail.

{¶ 32} Carl Trowbridge, an employee of the Franklin County Sheriff's Office, is commander of the professional services bureau at the Franklin County Jail.  Trowbridge testified he is familiar with the record-keeping procedures at the jail and identified state's Exhibit O as a document reporting the cell population of "2-west-6" at the Jackson Pike facility "from January 20, 2017 through August 20th of 2017."  (Tr. at 525.)  Trowbridge stated the bunks at 2-west-6 are approximately "three-to three-and-a-half feet" apart.  (Tr. at 534.)  Trowbridge verified that Jackson was an inmate housed in 2-west-6 from January 2 until July 13, 2017; that appellant was an inmate housed in 2-west-6 from January 20 until August 20, 2017; and that R.S. was an inmate housed in 2-west-6 from March 28 until August 10, 2017.

{¶ 33} In 2016, Pataskala Police Detective James Wiles conducted an investigation of suspicious prescription pads in his jurisdiction.  The police department received

information regarding "possible fraudulent prescriptions" at the Pataskala Medical Center. (Tr. at 540.)   Detective Wiles stated that an individual named Monica R., a medical assistant, was an initial person of interest; according to the detective, Monica would "answer the phone and validate these prescriptions that were fraudulent."  (Tr. at 540-41.) The detective also testified that a vehicle used in the prescription scheme was registered to appellant.

{¶ 34}  Detective Carlson served as the lead detective in the case involving the death of Conner.  As part of the investigation, Detective Carlson met with Troy Boyce, a local business owner who had surveillance cameras installed on his building.  A police detective downloaded surveillance video, and Detective Carlson sent the video to the Ohio Organized Crime Bureau in an attempt to have the video enhanced.

{¶ 35}  The jury saw clips from the video during the testimony of Detective Carlson, who described the video as it played.  Detective Carlson stated the video shows a "passenger gets out of the back seat."  (Tr. at 563.)  Although the video was not clear enough to make out faces, the detective "believed it was a male" who exited the vehicle.  (Tr. at 563.) According to the detective, "[i]t appears that a body, an object, was forced out of the front passenger door.  You could see the vehicle kind of moving, and then you could see an object hit the ground."  The individual outside the vehicle then "got in the back seat passenger side of the vehicle and closed the door."  (Tr. at 565.)  In a second video, the vehicle returned to the area with the headlights turned off and the same "back-seat passenger got back out. * * * Now, he's bent over the body.  It looks like he's possibly rummaging through the body, through the pockets."  (Tr. at 566.)  The individual then gets back into the "rear passenger side" of the vehicle.  (Tr. at 567.)  Detective Carlson stated a cell phone was not recovered from the shooting victim.

{¶ 36}  Detective Carlson spoke with Conner's mother and obtained his cell phone number (ending in 1885).  Three out of four of the last contacts on Conner's phone were to the number 614-246-****, which Detective Carlson identified as a number from a burner phone.  The detective described a burner phone as "a prepaid phone where you don't give any subscriber information.  You pay for the phone, and they give you a certain amount of minutes."  (Tr. at 571.)  The purchaser of a burner phone is not required to provide a name or address.

{¶ 37} During the investigation, Detective Carlson spoke with Conner's girlfriend, Coreus, who indicated Conner had been involved in a check cashing scheme. Coreus also mentioned the name "Dub" to the detective. (Tr. at 575.) The detective later learned that the individual referred to as Dub was appellant.

{¶ 38} On January 8, 2017, Detective Carlson spoke to Walker, who lived with Conner on Minnesota Avenue. During that conversation, Walker mentioned the name "Dub," and he described this individual as a "male black, light skin, short-cut hair, kind of stocky build, in his late thirties or early forties." (Tr. at 577.) Walker had previously seen Conner in the presence of Dub. Walker stated that Dub drove a "Chevy Tahoe." (Tr. at 578.)

{¶ 39} From the information gathered, Detective Carlson "believed that Mr. Conner and Dub were involved in criminal activity." (Tr. at 578.) The detective subsequently searched vehicle records near Gimbles Drive, Columbus, and obtained information that a 2005 Chevy Tahoe, black in color, "was registered to Warriayre Roundtree." (Tr. at 580.) Detective Carlson stated appellant "fit the description that I was given by Mr. Walker." (Tr. at 581.)

{¶ 40} The detective eventually obtained appellant's address. On January 19, 2017, police executed a search warrant for appellant's residence on Gimbles Drive, Columbus. Two firearms were recovered during the search; one of the firearms was found in a kitchen cabinet, while the other weapon was found in the master bedroom. Police officers also found marijuana in a Pittsburgh Steelers bag, and a Chevy Tahoe was impounded during the search. Appellant's phone number (ending in 1690) was also obtained. Detective Carlson first interviewed R.S. on August 10, 2017.

{¶ 41} In 2015, Columbus Police Detective Kevin Wangler was assigned to the department's burglary unit. On October 1, 2015, Detective Wangler investigated an incident at appellant's residence on Gimbles Drive. On the date of the incident, appellant was inside his residence when there was a knock on his front door. Appellant did not recognize the individual on the porch. As a result of that incident, Detective Wangler determined he had probable cause to file charges against Conner and two other individuals. The defendants were each indicted for one count of attempted burglary and two counts of failure to comply with an order or signal of a police officer; the charge of attempted burglary

included a body armor specification. Detective Wangler testified that a nolle prosequi was subsequently filed (on October 4, 2016) dismissing the charges against Conner.

{¶ 42} Miranda Aufiero, a DNA analyst for the Columbus Police Crime Laboratory, testified she tested several pieces of evidence with respect to Conner, including blood from his sweatshirt. Appellant's DNA was not found on Conner's clothing.

{¶ 43} Erica Pattie, a forensics expert with the Columbus Police Crime Lab, performs analysis and identification of firearms and ballistics. Pattie testified that the three .38-caliber bullets removed from Conner's body were identified as "having come from the same unknown firearm." (Tr. at 729.) According to Pattie, .38-caliber bullets could be fired from a 9 mm Glock. Pattie opined that the fourth bullet was "fired from the same firearm." (Tr. at 736-37.)

{¶ 44} On January 9, 2017, Dr. Donald Pojman, a forensic pathologist and deputy coroner with the Franklin County Coroner's Office, performed an autopsy on Savaughn Conner. Dr. Pojman listed the cause of death as "gunshot wounds to the torso." (Tr. at 761.) He testified there were five gunshot wounds to the victim, and three bullets were recovered from the body. The wounds were all to the left side of the victim; two of the wounds entered the left side of the chest and "would have been fatal by themselves." (Tr. at 777-78.) According to Dr. Pojman, "[a]nytime a bullet enters the body and leaves the body, there's going to be blood loss. In this gentleman's case, most of the blood would be pooling on the inside." (Tr. at 778.) Dr. Pojman could not state whether there were four or five bullet strikes. He explained: "There's at least four and the possibility that there's five because we have five gunshot wounds. Four of them have to be single shots that were towards this individual. The one to the arm could have re-entered." (Tr. at 799.)

{¶ 45} Columbus Police Detective James Howe, a member of the department's digital forensic unit, described a "burner phone" as a "lower-end model phone where you will have a pay-as-you-go service where you don't have to provide any information to the company." (Tr. at 819.) Detective Howe identified state's Exhibit N-1 as "T-Mobile phone records for a subscriber, Savaughn Conner" (with the phone number ending in 1885). (Tr. at 823.) The detective also identified state's Exhibit N as the historical cell site data for the burner phone (with the number ending in 1385), and he identified state's Exhibit Q-2 as the historical cell site data for appellant's cell phone (with the number ending in 1690). The

parties stipulated that roundtree***@gmail.com is "an associated Gmail" on the account of appellant's phone number ending in 1690. (Tr. at 824.)

{¶ 46} Detective Howe performed historical cell site analysis on the burner phone, and he also performed Google geolocation analysis with respect to the Gmail address . According to the detective, "[t]he historical cell site location is going to provide you a general location of where the device was based on the tower that it selected and the sector that it was on," while "[t]he Google geolocation information is going to be much more accurate location information." (Tr. at 830.)

{¶ 47} Regarding the events of January 7, 2017, Detective Howe testified that, at 10:35 p.m., Conner's phone dialed the number of the burner phone. The burner phone was located near Gimbles Drive at the time. At 10:40 p.m., a call was placed by the burner phone; the call lasted "432 seconds." The call from the burner phone began near Gimbles Drive and then ended in the area of "Columbus State Community College." (Tr. at 843.) The detective stated the call was heading in a northeast pattern, in the direction of Minnesota Avenue. At 10:58 p.m., the burner phone received an incoming call that lasted four seconds. The phone was in the North Linden area at the time. At 11:13 p.m., there was an outgoing call from the burner phone that lasted 41 seconds; the call was made from the "general location * * * in the area of 2169 South James Road." (Tr. at 848.) At 1:57 a.m., there is an outgoing call from the burner phone in the location of "Jay's Sports Lounge" on Sullivant Avenue. (Tr. at 849.) Detective Howe stated the burner phone and appellant's phone were in the "same general area" at that time. (Tr. at 864.) At 3:26 a.m., the phone associated with appellant's account moves northbound from the area of Jay's Sports Lounge toward West Broad Street, and at 3:26 a.m. "moves * * * southeast towards * * * Gimbles." (Tr. at 859.)

{¶ 48} At the close of the state's case-in-chief, counsel for appellant made a Crim.R. 29 motion for judgment of acquittal. The trial court denied the motion as to all of the counts except the kidnapping count.

{¶ 49} Cumberland was called as a witness on behalf of the defense. Cumberland testified he had been "locked up" with appellant. (Tr. at 928.) Cumberland stated he never heard appellant say anything about his pending murder case. On cross-examination, when asked whether he ever told a detective he heard appellant state "he had to shoot and kill

someone because they were trying to rob him," Cumberland responded: "I really don't know.  It was so long ago."  (Tr. at 932.)

{¶ 50} Following deliberations, the jury returned verdicts finding appellant guilty of aggravated robbery, two counts of aggravated murder, two counts of murder, and one count of tampering with evidence, all with firearm specifications.  The trial court separately found appellant guilty of having a weapon while under disability.

{¶ 51} In announcing its finding of guilt for the weapon under disability count, the trial court stated in part:

> So the issue is whether or not I believe beyond a reasonable doubt * * * [R.S.], and I do.  You would have to be the most unlucky human being in the world for his testimony not to be true.
>
> Here's all the things he knew.  He knew the vehicle he had.  He knew the speaker system.  He knew that the vehicle went back to the scene twice.  He knew a .38 was used.  He knew about the check scheme.  He knew about the prescriptions.  He knew about Monica, the African-American.
>
> He said he was shot five times.  The coroner said it * * * could have been four or five.  He knew there were two people in the vehicle.  He knew a body was dumped.  He had no contact with the feds for that.
>
> He couldn't have gotten the information from anybody except you.  And only the murderer would know a lot of the details of what happened or somebody involved in the murder.  How else could he have all those details?
>
> He confirmed the names of the people you were with.  He knew your address.  He knew about the body armor and the burglary. I mean, unless you told him, how the heck would he know marijuana was found in a Steelers bag?  He also knew the caliber of the gun.
>
> So one witness, if believed beyond a reasonable doubt, is sufficient to prove any fact.  You admitted the shooting to him. I believed him.  I believed him beyond a reasonable doubt.

(Tr. at 1056-57.)

{¶ 52} For purposes of sentencing, the trial court merged Counts 3, 4, 5, and 6. By judgment entry filed December 20, 2019, the trial court sentenced appellant on Counts 2, 4, 7, and 8, for a total sentence of 36 years to life.

{¶ 53} On appeal, appellant sets forth the following three assignments of error for this court's review:

> [I.] Appellant's convictions for Aggravated Murder, Murder, Aggravated Robbery, Weapon Under Disability, and Tampering with Evidence were not supported by sufficient evidence.
>
> [II.] Appellant's convictions for Aggravated Murder, Murder, Aggravated Robbery, Weapon Under Disability, and Tampering with Evidence were against the manifest weight of the evidence.
>
> [III.] The trial court erred in informing the jury that [appellant's] admitted he was involved with the victim in a check-cashing scheme and counsel was ineffective for failing to object to the court's statement and for neglecting to introduce evidence that the State's star witness had access to Appellant's discovery materials before he provided information to the authorities.

{¶ 54} Appellant's first and second assignments of error are interrelated and will be considered together. Under these assignments of error, appellant challenges the sufficiency[1] and weight of the evidence supporting his convictions.

{¶ 55} In considering a "claim of insufficient evidence, the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). By contrast, the test for considering whether a conviction is against the manifest weight of the evidence is "much broader," whereby "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly

---

[1] We note, while appellant's statement of assignment of error under his first assignment of error lists each of his convictions (i.e., aggravated murder, murder, aggravated robbery, weapon under disability, and tampering with evidence), the argument set forth in the body of the first assignment of error only addresses sufficiency challenges as to the convictions for aggravated robbery and aggravated murder.

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

{¶ 56} Appellant first contends there was insufficient evidence to permit a rational trier of fact to find the essential elements of aggravated robbery under Count 2 of the indictment. That count charged appellant with aggravated robbery in violation of R.C. 2911.01(A)(1) and/or (A)(3).

{¶ 57} R.C. 2911.01(A) states in part:

> No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
>
> * * *
>
> (3) Inflict, or attempt to inflict, serious physical harm on another.

{¶ 58} In challenging his conviction for aggravated robbery, appellant argues there was insufficient evidence to prove he "had a weapon on his person when committing or attempting to commit a theft offense and that he brandished or used the firearm to cause harm to Mr. Conner." (Appellant's Brief at 21.) Appellant's argument is premised on his claim the evidence at trial only arguably indicated a theft offense occurred after Conner's death. More specifically, appellant maintains the state's theory of the case was that the murderer returned to the victim's body to retrieve his cell phone. According to appellant, one cannot commit an aggravated robbery on a dead body.

{¶ 59} Appellant's argument, going to the issue of whether a criminal defendant "killed before he stole or stole before he killed is of no consequence." *State v. Palmer*, 80 Ohio St.3d 543, 571 (1997). *See also State v. Thompson*, 10th Dist. No. 07AP-491, 2008-Ohio-2017, ¶ 31 (in considering sufficiency of the evidence to support convictions for aggravated robbery and felony murder, "the fact that appellant took [the victim's] property immediately after [the victim] died is of no consequence"). Rather, under Ohio law, "the victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of

asportation." *State v. Smith,* 61 Ohio St.3d 284, 290 (1991). *See also State v. Twyford*, 94 Ohio St.3d 340, 354 (2002) ("This court has consistently rejected arguments that no robbery occurred because the murder victim was already dead at the time of the theft.").

{¶ 60} In the present case, the state's evidence regarding the events at issue included the testimony of R.S., who stated he overheard a conversation between appellant and another inmate, Jackson, in which appellant told Jackson he "decided * * * I was going to kill him" (i.e., Conner). (Tr. at 456.) According to R.S., appellant related that he and his wife picked up Conner in appellant's SUV under the pretense of getting a drink; while riding in the vehicle, appellant "turned the music up real loud" and then "turned around and shot him five times." (Tr. at 457.) Appellant then dumped the body "next to some trash." (Tr. at 458.) After dumping the body, appellant drove away for "two or three minutes" but then returned to where he left the body because he "forgot" to take Conner's cell phone. (Tr. at 459-60.) After retrieving the phone, appellant deleted all the phone messages between himself and Conner; he then "broke the phone" and "threw it away with the gun." (Tr. at 461.) The state also presented evidence, based on the testimony of Walker, that Conner had his cell phone with him when he left Walker's residence that evening and rode away in appellant's SUV. The lead detective in the case testified that no cell phone was found on Conner.

{¶ 61} Construing the evidence most strongly in favor of the state, there was sufficient evidence upon which a trier of fact could find appellant brandished or used a deadly weapon in committing a theft offense and/or that he inflicted serious physical harm while committing a theft offense. Accordingly, we find unpersuasive appellant's sufficiency challenge to his conviction for aggravated robbery.

{¶ 62} Appellant also challenges his conviction for aggravated felony murder. R.C. 2903.01(B) states in part: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery."

{¶ 63} Similar to his sufficiency challenge to his conviction for aggravated robbery, appellant contends the evidence as to aggravated felony murder was based on speculation he returned to Conner's body to retrieve the cell phone, i.e., appellant maintains the evidence was insufficient to support a conviction for felony murder because it only arguably

showed a theft offense occurring after Conner's death. Appellant's position, however, is not supported by Ohio law.

{¶ 64} The Supreme Court of Ohio "has held that the actual robbery need not take place while the victim was still alive in order to convict for felony murder." *State v. Johnson*, 88 Ohio St.3d 95, 115 (2000), citing *State v. Rojas*, 64 Ohio St.3d 131, 139 (1992). Further, the Supreme Court has held " '[t]he term "while" does not indicate * * * that the killing must occur at the same instant as the [predicate felony], or that the killing must have been caused by the [felony].' " *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 55, quoting *State v. Cooper*, 52 Ohio St.2d 163, 179-80 (1977). Nor does the law require "that the felony must have been the motive for the killing." *Id.*, citing *State v. Williams*, 74 Ohio St.3d 569, 577 (1996). Instead, " 'while' means that 'the killing must be directly associated with the [felony] as part of one continuous occurrence.' " *Id.* at ¶ 56, quoting *Cooper* at 179-80. Accordingly, " '[t]he term "while" means that the death must occur as part of acts leading up to, or occurring during, or immediately subsequent to the [relevant felony].' " *Id.*, quoting *Williams* at 577.

{¶ 65} We have previously noted the evidence in support of the conviction for the underlying felony (aggravated robbery). In a similar vein, with respect to the crime of felony murder, the prosecution presented evidence that, if believed, indicated appellant intended to, and did, kill Conner as they were riding in appellant's SUV, and that appellant then dumped Conner's body near South James Road. After dumping the body, appellant left the scene but returned a few minutes later because he forgot to take Conner's cell phone. After retrieving the cell phone, appellant left the scene and subsequently broke the phone, throwing it away along with the weapon used.

{¶ 66} On review, we agree with the state's contention there was evidence indicating the murder was associated with the underlying felony " 'as part of one continuous occurrence.' " *Johnson*, 2006-Ohio-6404, at ¶ 56, quoting *Cooper* at 179-80. *See also Williams* at 577 (Supreme Court noting, in reviewing its prior decision in *Rojas*, that evidence need not establish the offender formed an intent to commit predicate felony at or prior to time he committed murder as "Rojas did not rob his victim until hours after he had stabbed her and the case reflects that he did not stab her in order to rob her"). Here, construing the evidence most strongly in favor of the state, the record contains sufficient

evidence to support appellant's conviction for aggravated felony murder under R.C. 2903.01(B).

{¶ 67} Appellant also contends the evidence was insufficient to support his conviction under R.C. 2903.01(A) for the offense of aggravated murder by prior calculation and design.  R.C. 2903.01(A) states in part: "No person shall purposely, and with prior calculation and design, cause the death of another."

{¶ 68}  Under Ohio law, "[p]roof of 'prior calculation and design' requires proof of 'a scheme designed to implement the calculated decision to kill.' " *State v. Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, ¶ 60, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978). Although prior calculation and design "requires something more than instantaneous deliberation, it does not require a drawn-out thought process." *State v. Gamble*, 10th Dist. No. 16AP-397, 2017-Ohio-1527, ¶ 23, citing *Cotton* at 11.

{¶ 69} The Supreme Court has listed the following three factors as useful in reviewing a defendant's claim that evidence was insufficient to prove prior calculation and design: " '(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? (3) Was the act drawn out or "an almost instantaneous eruption of events"?' " *Hundley* at ¶ 61, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist.1976).

{¶ 70} In challenging the sufficiency of the evidence to support his conviction for aggravated murder with prior calculation and design, appellant contends no rational trier of fact could rely on the testimony of R.S. to determine he was responsible for the death of Conner.  However, as noted by the state, appellant's argument is essentially that R.S. was not credible, a determination that goes to the manifest weight, not sufficiency, of the evidence.  *See State v. Williams*, 8th Dist. No. 98528, 2013-Ohio-1181, ¶ 27 ("[w]hen reviewing a verdict for sufficiency of the evidence, we do not consider credibility"); *State v. Murphy,* 91 Ohio St.3d 516, 543 (2001) (while appellant argues evidence is unreliable, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations").  Rather, in conducting a sufficiency review "we 'examine the evidence admitted at trial to determine whether such evidence, *if believed*, would convince the

average mind of the defendant's guilt beyond a reasonable doubt.' " (Emphasis sic.) *Williams*, 2013-Ohio-1181, at ¶ 27, quoting *State v. Jenks,* 61 Ohio St.3d 259, 273 (1991).

{¶ 71} At trial, the state presented evidence appellant and Conner knew each other and that their relationship had become increasingly strained over several issues including an incident in 2015 in which Conner and several other individuals approached appellant's residence wearing body armor; that incident resulted in an indictment against Conner, which included a charge for attempted burglary. While the charges against Conner were subsequently dismissed, there was evidence Conner left the area out of concern for his safety. According to the testimony of R.S., appellant stated "that [Conner] went underground after that. * * * 'He knew what I was going to do, and he went underground. He hid out in North Carolina.' " (Tr. at 479.) R.S. testified appellant told Jackson that, following the incident in 2015, " '[t]hat's when I made up my mind that I was going to kill him.' " (Tr. at 479.)

{¶ 72} Regarding the events of January 7, 2017, the state's theory of the case was that Conner was lured out of his residence (under the pretense of having a drink) to facilitate the killing. According to the state, appellant meticulously planned the murder, utilizing a burner phone that evening and leaving his personal cell phone in the parking lot of a sports bar to conceal his activity. The state presented testimony that appellant indicated he used .38-caliber bullets with a 9 mm weapon " 'so it would throw the detectives off so they would be looking for a .38.' " (Tr. at 463.)

{¶ 73} The state presented evidence that the burner phone was in the area of Conner's residence at 10:58 p.m., and that it was in the vicinity of South James Road (i.e., the area where the body was dumped) at 11:13 p.m. The state also presented evidence, through the testimony of R.S., that appellant stated he turned up the music "real loud" and then "turned around and shot him five times" as they were traveling in the SUV. (Tr. at 457.) R.S. testified that appellant stated he " 'tried to shoot him in the heart because I didn't want to shoot him in the head and mess up my truck.' " (Tr. at 457-58.) Appellant related that "[h]e took him somewhere, and he threw him next to some trash." (Tr. at 458.) Appellant also stated he retrieved Conner's cell phone from his pocket and "he broke the phone, and he threw it away with the gun." (Tr. at 461.) Here, construing the evidence most strongly in favor of the state, a rational trier of fact could have found the element of

prior calculation and design beyond a reasonable doubt, and the evidence presented was sufficient to support appellant's conviction for aggravated murder under R.C. 2903.01(A).

{¶ 74} Appellant also contends his convictions were against the manifest weight of the evidence. We note appellant's argument under this assignment of error is general in nature, asserting this court should find the jury clearly lost its way in returning guilty verdicts.

{¶ 75} To the extent appellant may be challenging the credibility of R.S., it was within the province of the jury to assess his testimony, and the jury was free to "believe or disbelieve any or all of a witnesses' testimony." *State v. Hudson,* 10th Dist. No. 06AP-335, 2007-Ohio-3227, ¶ 18, citing *State v. Jackson*, 10th Dist. No. 01AP-973 (Mar. 19, 2002). In this respect, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. Further, "even in cases where a witness may have something to gain, such as with a 'jailhouse snitch,' the credibility of that witness is left to the finder of fact." *State v. Starkey*, 11th Dist. No. 2017-A-0022, 2017-Ohio-9327, ¶ 55. *See also State v. McClendon*, 10th Dist. No. 11AP-354, 2011-Ohio-6235, ¶ 25 (jury heard testimony about alleged benefit "snitch" might receive and could "consider it accordingly in weighing [his] testimony").

{¶ 76} In the instant case, the state provided evidence to corroborate R.S.' testimony, including the cell phone records, testimony by other witnesses regarding appellant's involvement with the victim in a check cashing scheme, the fact marijuana was found in a Pittsburgh Steeler's bag following a search of appellant's home, and Walker's testimony that he saw Conner leave and get into appellant's vehicle on the evening of January 7, 2017. Upon review, we find the jury did not lose its way in reaching its verdict, and we decline to substitute our judgment for that of the trier of fact.

{¶ 77} Based on the foregoing, we conclude there was sufficient evidence to support appellant's convictions, and that the convictions were not against the manifest weight of the evidence.

{¶ 78} Accordingly, appellant's first and second assignments of error are not well-taken and are overruled.

{¶ 79} Under his third assignment of error, appellant argues the trial court erred in informing the jury he admitted his involvement with the victim in a check cashing scheme.

Appellant also raises an ineffective assistance of counsel claim, asserting his trial counsel was ineffective in failing to object to the above statement, and in neglecting to introduce evidence that the state's star witness had access to appellant's discovery materials before providing information to authorities.

{¶ 80} Appellant first argues the trial court, in providing an instruction on "other acts" testimony, misinformed the jury as to the purpose of presenting prior convictions of one of the state's witnesses. By way of background, prior to the testimony of Seals, the prosecution informed the trial court that her testimony would involve prior bad acts evidence under Evid.R. 404(B), going to the issue of motive and to corroborate "what the snitch is going to say." (Tr. at 335.) The trial court ruled at the time: "I'll give a cautionary instruction over objection. I'm going to go ahead and allow it." (Tr. at 337.)

{¶ 81} As set forth under the facts, Seals testified that Conner had introduced her to cashing fake checks. Seals further testified that she met appellant, who she knew as "Doug," through Conner, and that appellant was the driver on trips with Conner to cash checks. (Tr. at 343.) Seals stated appellant "was the one that had the checks." (Tr. at 344.) During cross-examination, defense counsel inquired about Seals' prior convictions. At the end of Seals' testimony, the trial court instructed the jury that "the conviction is for credibility, not that he's a bad person. They're admitting that he was with this group passing checks, but you can't use it that he's more likely to commit a crime." (Tr. at 350.) Defense counsel did not object to the above instruction.

{¶ 82} On appeal, appellant argues the defense did not admit he was with the group passing bad checks. Appellant contends such an assurance was prejudicial, as it was one method the state used to tie appellant to Conner.

{¶ 83} In response, the state argues the defense did not dispute the fact appellant knew Conner, or that they were involved in a check cashing scheme. The state notes, at the time of the trial court's instruction, two witnesses (Walker and Seals) had already testified and implicated themselves as participants, and these witnesses also implicated Conner and appellant as principals and cohorts in the check cashing scheme; further, while defense counsel cross-examined both Walker and Seals, counsel did not question their testimony regarding the check cashing operation nor object to the trial court's cautionary instruction. The state also notes R.S. subsequently testified as to both appellant and Conner's

involvement in the check cashing scheme, and that Detective Carlson testified Conner's girlfriend provided information that Conner was involved in a scheme also involving appellant.

{¶ 84} The state argues the trial court properly instructed the jury not to use Seals' conviction against appellant, and maintains the challenged part of the instruction (i.e., "[t]hey're admitting that [appellant] was with this group passing checks") was merely stating the obvious, and therefore did not constitute error. Finally, the state argues, even if the trial court's instruction was improper, it did not constitute plain error.

{¶ 85} A review of the record supports the state's contention the defense did not contest evidence that Conner and appellant were acquainted or that they were involved in a check cashing scheme. In this respect, the state presented the testimony of several witnesses, including Walker, Seals, and R.S., regarding such activity. The record also indicates defense counsel did not make a contemporaneous objection challenging the language utilized by the trial court in the cautionary instruction provided, and we therefore agree with the state that appellant has waived all but plain error as to this issue.

{¶ 86} Pursuant to Crim.R. 52(B), " '[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' " *State v. Greene*, 10th Dist. No. 17AP-238, 2019-Ohio-4010, ¶ 60, quoting Crim.R. 52(B). In order to demonstrate plain error, a defendant "must show that (1) there was an error, (2) the error was 'plain,' i.e., obvious, and (3) the error affected substantial rights." *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 217, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). To demonstrate that an error affected substantial rights, a defendant "must show 'a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims.' " (Emphasis sic.) *Id.* at ¶ 218, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22. Therefore, a defendant "must show 'that the probability of a different result is "sufficient to undermine confidence in the outcome" of the proceeding.' " *Id.*, quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). *See also Greene* at ¶ 60, quoting *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 37 (noting " 'plain error occurs only when, but for the error, the outcome of the trial clearly would have been different' ").

{¶ 87}   Further, " '[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.   In reviewing a claim of alleged plain error with respect to a jury instruction, an appellate court "must review the instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions."   *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, ¶ 17.

{¶ 88}   On review, while the now challenged language of the trial court's instruction was arguably awkward, it was also arguably consistent with the evidence presented at trial, and we find the court's cautionary instruction as a whole can be reasonably understood to mean the prior conviction of Seals was not to be used against appellant.   However, even assuming the trial court erred in employing the language at issue, appellant has failed to demonstrate either prejudice or plain error resulting in a manifest miscarriage of justice.   Rather, based on a consideration of the instructions as a whole and the entire record, we conclude there is no reasonable probability appellant would have been acquitted of the charges had the trial court omitted the now contested portion of the instructions.

{¶ 89} As noted, appellant also raises two claims of ineffective assistance of trial counsel.   The reversal of a conviction based on a claim of ineffective assistance of counsel requires a defendant "to show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Worley*, ____ Ohio St.3d.___, 2021-Ohio-2207, ¶ 95, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus.   In order to succeed on a claim of ineffective assistance, a defendant "must overcome 'the strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance.' " *Id.,* quoting *Strickland* at 689.   Further, "[t]he issue regarding counsel's performance for any ineffective-assistance-of-counsel claim is whether counsel's assistance was reasonable considering all the relevant circumstances." *Id.*

{¶ 90}   Appellant first contends his trial counsel was ineffective in failing to object to the language in the cautionary instruction discussed above.   Specifically, appellant argues

his counsel's failure to object was "tantamount" to admitting appellant and Conner were criminal associates, and that counsel's deficient performance was "so prejudicial that the jury would likely have acquitted [appellant] had they not been so misinformed." (Appellant's Brief at 27.)

{¶ 91} In previously addressing appellant's challenge to the trial court's cautionary instruction, we found, even assuming the trial court erred in employing the language at issue, no plain error occurred. Having found no plain error with respect to the instruction, we further find appellant cannot show counsel's performance in failing to object to the instruction constituted prejudicial error under the second prong of *Strickland. See, e.g.*, *State v. Horsley,* 10th Dist. No. 05AP-350, 2006-Ohio-1208, ¶ 42 (where reviewing court found lack of limiting instruction by trial court did not constitute plain error, appellant's claim of ineffective assistance failed as he could not demonstrate reasonable probability that outcome of trial would have been different had counsel objected to lack of limiting instruction).

{¶ 92} Appellant also contends his trial counsel was ineffective in failing to present evidence that a prior attorney provided him with documents and evidence that R.S. presumably could have obtained access to at the time they were housed together in the county jail. Appellant maintains trial counsel's failure to present such evidence deprived him of a crucial defense.

{¶ 93} In response, the state argues the record fails to show any evidence of ineffective assistance of counsel on this issue. The state maintains the issue of whether or not R.S. learned of this information from anyone other than appellant was raised several times during trial. Specifically, the state notes, during the testimony of Detective Jones, the trial court inquired during a sidebar (outside the presence of the jury) whether R.S. could have received any information "other than getting it from [appellant]." The prosecutor represented to the court: "No. No. We're using it as corroboration." (Tr. at 221.) Defense counsel then stated to the court: "My take on the informant, just to get the cat out of the bag, my client had discovery materials in the tank." In response, the prosecutor stated: "Not then. * * * He wouldn't have got discovery until much later." (Tr. at 222.)

{¶ 94} According to the state, the above exchange points out the difficulty with appellant's assertion he received discovery information from a former attorney that related

to the issues in this case. More specifically, the state notes, while appellant and R.S. were housed together in the county jail from March 28 to August 10, 2017, at which time appellant was apparently in custody on issues related to a federal charge, appellant was not indicted in the present case until April 6, 2018 (i.e., approximately eight months after last being housed in a facility with R.S., and thus raising questions whether appellant's claimed discovery documents relating to this murder actually existed).

{¶ 95} The state notes the issue was next addressed during the direct examination of R.S., in which the prosecution inquired how he learned about the events to which he was testifying. R.S. responded: "I lived right next to him for four months. He told me everything that I'm saying. I would not know any of these things unless he told me himself." (Tr. at 480.) The state argues that, contrary to appellant's contention, defense counsel did inquire of R.S. whether he received his information from appellant. In support, the state cites to portions of defense counsel's cross-examination, in which counsel asked R.S. whether appellant "told you all this stuff," and questioned R.S. as to whether he "overheard all of these things?" R.S. responded: "He told me some of these things in conversation within the four months we spent together, and he told Miles Jackson in front of me directly about the night that he killed this person." (Tr. at 515.)

{¶ 96} The state observes the final reference to this issue came during sentencing, when defense counsel stated to the court: "My client has indicated to me that he had some material that was provided by a prior attorney pre-indictment that had some facts regarding the underlying homicide here and continues to maintain that [R.S.] did not learn what he did learn from the mouth of [appellant] but from the documents that [appellant] had available to him while he was in 2-west-6 with [R.S.]" (Tr. at 1073.)

{¶ 97} The state asserts appellant made no effort to introduce any document R.S. purportedly reviewed, nor does the record contain any evidence that such a discovery document actually existed. The state argues, therefore, in the absence of record evidence to support appellant's claim of discovery materials, he cannot overcome the presumption counsel provided effective assistance.

{¶ 98} On review, we agree with the state's contention there is nothing in the appellate record to support appellant's claim he had discovery material relating to the crimes at issue that was purportedly reviewed by R.S. during the time they were housed

together in the county facility. Despite trial counsel's comments at sentencing regarding appellant's allegation R.S. must have obtained information about the case from materials in the jail facility, the trial court was presented with no supporting documents or evidence on this issue. The record also supports the state's contention that defense counsel did question R.S. on this issue during cross-examination and, assuming the absence of any substantive proof the materials existed or that R.S. would have had access to such documents during that time period, counsel may have deemed cross-examination to be the most reasonable and effective strategy. Here, the record on appeal fails to support a claim of ineffective assistance of counsel on this issue.

{¶ 99} Appellant's third assignment of error is without merit and is overruled.

{¶ 100} Based on the foregoing, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

KLATT and SADLER, JJ., concur.

_____